**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | |
|---|---|
| _____ )<br><br>THE INFORMATICS APPLICATIONS )<br>GROUP, INC., )<br>   *Plaintiff,* )<br>     )<br> v. )<br>     )<br>MARK B. SHKOLNIKOV and )<br>KEYNETIK, INC., )<br>   *Defendants.* )<br>_____ ) | Case No. 1:11-cv-726 (JCC/JFA) |

## AMENDED COMPLAINT

Plaintiff The Informatics Applications Group, Inc. ("tiag"), by its undersigned attorneys,

for its amended complaint against Defendants Mark B. Shkolnikov and KEYnetik, Inc.

(collectively "Defendants"), alleges and states as follows:

## NATURE OF ACTION

This is an action by tiag, a privately owned government information systems technology

company based in Reston, Virginia, against its former employee Mark B. Shkolnikov

("Shkolnikov") and his privately owned company KEYnetik, Inc. ("KEYnetik"), arising out of

Shkolnikov's breach of his employment agreements and other duties owed to tiag.  Tiag

employed Shkolnikov, a systems engineer by training, for over eight years as a Senior Systems

Engineer and Chief Technology Officer for the company.  During that time Shkolnikov

collaborated with others at tiag, including tiag's co-founder and Managing Principal Fred

Goeringer, to develop requirements, technology, and know-how for a spectrum of information

systems with particular emphasis on hand-held electronic devices.  This know-how and the

related technologies were all developed within the scope of Shkolnikov's employment at tiag,

and all for tiag customers and tiag projects.  Despite this, Shkolnikov has attempted – through the patent process and otherwise – to take ownership of these technologies solely for his own benefit and for the benefit of KEYnetik, and to tiag's exclusion.

As a condition of his employment, Shkolnikov assigned all rights, title and interest in and to any technology advancements, and all resulting benefits or rights, to tiag.  Shkolnikov acknowledged these requirements as a condition of employment at tiag by signing certain employment agreements, including an assignment agreement.  Shkolnikov materially breached these agreements by filing for (and in at least two instances already obtaining) patents covering the very technology advancements developed at tiag, and then attempting to use these advancements for the benefit of himself and his own company, KEYnetik, and to tiag's exclusion.  More specifically, Shkolnikov failed to ensure that these technology advancements remained the "sole and exclusive property of" tiag, failed to "promptly disclose" all facts about these technology advancements to tiag, and improperly attempted to assign "all rights, title and interest (including, but not limited to, all patent rights, copyrights and trademarks)" regarding these technology advancements to KEYnetik, knowing that he had already assigned such rights to tiag.

In the first patent that issued, Shkolnikov failed to list Mr. Goeringer as a co-inventor, nor did he list tiag as the assignee of any of the patents or patent applications.  In fact, in four more recent patent applications, all filed while he was still employed by tiag, Shkolnikov listed KEYnetik as the assignee.  Using know-how he developed, in collaboration with Mr. Goeringer and other tiag staff while working at tiag, and for tiag customers, and using tiag's proprietary and confidential technical information and documents, Shkolnikov (and KEYnetik) subsequently have sought to commercialize, exploit, and profit from this technology and know-how.  These

actions constitute a breach of contract, and a misappropriation of tiag's corporate know-how and trade secrets in violation of statutory and common law.

For all of these reasons, and as enumerated more fully below, tiag seeks relief from this Court to remedy Shkolnikov's breach of his employment agreements, his improper attempt to assign the patent and patent applications to KEYnetik, and his conversion or misappropriation of tiag's valuable know-how and confidential technical information.  Tiag further seeks to correct inventorship on one of the patents for which tiag's Managing Principal, Mr. Goeringer, directly contributed to conception and development of the invention.

## THE PARTIES

1.      Tiag is a corporation organized and existing under the laws of the Commonwealth of Virginia.  Tiag has its headquarters and principal place of business at 1760 Reston Parkway, Suite 510, Reston, Virginia 20190.  Tiag develops and delivers information technology services and products to various customers in the Federal Government and commercial sector.

2.      On information and belief, Defendant Mark B. Shkolnikov is a Virginia resident with a mailing address of 2883 Franklin Oaks Drive, Herndon, Virginia 20171.

3.      On information and belief, KEYnetik, Inc. is a privately held company with its principal place of business located at 2883 Franklin Oaks Drive, Herndon, Virginia 20171.

4.      On information and belief, Shkolnikov is an owner of, doing business as, and an alter ego of KEYnetik.

## JURISDICTION AND VENUE

5.      Tiag incorporates the allegations contained in Paragraphs 1 through 4 above as though fully set forth herein.

6.      This Court has original and exclusive subject matter jurisdiction over this action under 28 U.S.C. §§ 1331 and 1338(a).

7.      This Court has supplemental jurisdiction over the state law claims in this action under 28 U.S.C. § 1367(a) because the state law claims arise out of the same operative facts as tiag's federal claims.

8.      This Court has personal jurisdiction over Shkolnikov by virtue of his residence in the Commonwealth of Virginia.

9.      This Court has personal jurisdiction over KEYnetik by virtue of KEYnetik's organization and existence under the laws of the Commonwealth of Virginia, and/or by virtue of KEYnetik transacting business in the Commonwealth of Virginia.

10.     Venue is proper in this judicial district under 28 U.S.C. § 1400(b).

**FACTS**

11.     Tiag focuses on the marketplace for developing information systems requirements and innovative systems know-how on behalf of its customer base, using emerging information systems technology to improve productivity to the benefit of its customer base.  Tiag's customers include various agencies of the United States government, as well as private commercial entities.  Tiag's services range from complex, enterprise-wide information systems solutions to stand-alone custom systems requirements projects.  Examples of tiag's services and projects include: clinical information applications for health care providers; knowledge management and business intelligence; enterprise, infrastructure and IT service management; web and mobile development technologies and implementation strategies; business process re-engineering; architecture and engineering for database driven systems; and information system program and project management.

**Mark Shkolnikov's Employment at tiag**

12.     Shkolnikov worked for tiag from March 1, 2002 until his employment was terminated on March 17, 2010.

13.     Shkolnikov was initially retained by tiag on a full-time basis as a senior systems engineer to provide expert systems engineering support internally to tiag and in support of the U.S. military's Theater Medical Information Program, pursuant to an independent contractor (1099) agreement signed February 25, 2002 (the "Letter Contract," attached hereto as Exhibit 1).

14.     Subsequently, on May 1, 2003, Shkolnikov became a tiag "W2" employee.  He was given the position as tiag's Chief Technology Officer and Senior Systems Engineer, entering into an agreement that governed his employment at tiag from May 1, 2003, until March 17, 2010 (the "Employment Agreement," attached hereto as Exhibit 2).

15.     On May 1, 2003, in connection with executing the Employment Agreement, Shkolnikov executed an Assignment of Inventions, Non-Disclosure, and Non-Competition Agreement (the "Assignment Agreement," attached hereto as Exhibit 3).

16.      As Chief Technology Officer, Shkolnikov's duties at tiag included and focused on research and development in the field of systems development and in particular hand-held computing devices and their applications.  He was expected to focus on developing technology and know-how for tiag in these areas by working with other tiag staff in pursuing small business innovative research (SBIR) grants, as well as developing know-how and expertise by working as a senior engineer on tiag contracts supporting major systems development acquisition programs such as the Theater Medical Information Program.

17.     The Theater Medical Information Program (TMIP) is a Military Health System program designed to integrate and develop medical information systems to capture the medical

record and link all theater levels of care in an integrated, interoperable fashion to provide enhanced medical care to the soldier on the battlefield.  The goal of TMIP is to provide integrated automation of the theater medical information environment.  TMIP supports field medical operations and decision making concerning theater medical capability by providing integrated health decision support systems to assure readiness for mission execution.  TMIP includes as one of its primary areas of focus the use of hand-held medical devices by first-responders and combat medics treating trauma during the "golden hour," which is the period of time immediately following a traumatic injury during which there is the highest likelihood that prompt medical treatment will prevent death and maximize recovery.

18.     During the entire time he worked at tiag, Shkolnikov reported directly to Fred Goeringer, tiag's co-founder, Managing Principal and Chief Information Officer.  Mr. Goeringer founded and served as the first program director of the Telemedicine and Advanced Technology Research Center (TATRC) while a U.S. Army Medical Services Corps Officer assigned to USAMRMC.  In this role, he conceived and implemented the product development and business vehicle for telemedicine and advanced technology for all military medicine in the Department of Defense.  During the first Iraqi war, Mr. Goeringer led a 35-person, multidisciplinary team of physicians, engineers and scientists to successfully deploy the first ever use of battlefield computed tomography and teleradiology for far-forward medical "golden hour" decision support.  Mr. Goeringer later served as Program Manager of the Army Medical Care Support Equipment (MEDCASE), bringing Army medical technology into the digital age.  Shkolnikov collaborated extensively with Mr. Goeringer and other tiag engineers and technical staff on numerous program, technical and engineering issues.

19.    During his employment, Shkolnikov's knowledge of systems and important systems requirements for information systems, and in particular handheld medical devices, was considerably enhanced by the nature of his duties at tiag and collaboration with Mr. Goeringer and others at tiag, and with users who were tiag supported customers for developing systems requirements.  For example, while an employee of tiag, Shkolnikov was actively engaged in the development of hand-held medical devices for tiag's work for the TMIP.  In this role, Shkolnikov collaborated with military medical experts, in both the military and at tiag, including Mr. Goeringer, and acquired considerable know-how and gained knowledge of tiag's Proprietary Information relating to hand-held medical devices and their utilization and implementation in the field.

20.    Shkolnikov's work as a senior systems engineer on behalf of tiag largely centered on four specific support engagements for tiag:  (1) The Theater Medical Information Program; (2) Handheld Device research engineering work at the United States Army Medical Research and Material Command, which involved developing and providing engineering support on the Military's Handheld Computing Device, known as BMIST-J; (3) Handheld Computing Device work in support of the Military Medical Force Health Protection Chief Information Officer at the Office of Secretary of Defense (Health Affairs); and (4) AHLTA Mobile and handheld medical device in support of the Defense Health Information Management System (DHIMS) for the Department of Defense.

21.    In three of these engagements, Shkolnikov collaborated directly with tiag's primary customer, the Senior Manager and Chief Engineer for Handheld Medical Devices in the Department of Defense.  Exposure to this particular tiag customer through working on these tiag

projects greatly enhanced Shkolnikov's knowledge of requirements and applications for these devices.

22.     While working on these tiag projects, Shkolnikov, Mr. Goeringer, and others at tiag collectively developed and enhanced certain know-how, expert understanding, and technologies for hand-held electronic devices and related systems technologies.  These technologies included advancements such as developing protocols and approaches to more efficiently provide innovative and improved methods for user input and interaction with hand-held computing devices – both for novel data input as well as device functional navigation.

23.     In particular, innovative methods and know-how were collectively developed for exploiting embedded accelerometer technology and developments such as location aware wireless networking.

24.     These innovative methods and know-how were often presented to tiag's customers in the form of written presentations, pursuant to non-disclosure and confidentiality agreements.  By way of example, one written presentation presented to a tiag customer was entitled "Freehand: Data Entry and Screen Navigation Solution for Cell Phones, Personal Digital Assistants, Pages, MP3 Players, Toys, GPS Receivers, e-Books, Remote Controls, Calculators, Cameras, Multimeters and Other Handheld Electronic Gadgets" (the "Freehand Presentation"). Shkolnikov, without tiag's knowledge or consent, incorporated many of the details of this presentation in U.S. Patent No. 7,002,553 and on KEYnetik's website.

### Shkolnikov's Employment Agreements

25.     Under the terms of the Letter Contract, Shkolnikov agreed to the following:

Al.  OWNERSHIP OF MATERIALS RELATED TO SERVICES. The parties agree that all ideas, know-how, processes, information, drawings, documents, designs, models, inventions, copyrightable material and other tangible and intangible materials authored, prepared, created, made, delivered, conceived or

reduced to practice, in whole or in part, by Contractor in the course of providing the Services, including without limitation computer programs, computer systems, data and documentation, (collectively, the "Works") are the sole and exclusive property of TIAG and shall be considered works made for hire.  In the event any such Works do not fall within the specifically enumerated works that constitute works made for hire under the United States copyright laws, Contractor hereby irrevocably, expressly and automatically assigns all right, title and interest worldwide in and to such Works to TIAG, including, without limitation, all copyrights, patent rights, trade secrets, trademarks, moral rights and all other applicable proprietary and intellectual property rights.

Ex. 1, Letter Contract, at page 6.

26.     Similarly, in the subsequent Assignment Agreement, Shkolnikov agreed that "[i]f at any time during his[] employment, Employee shall (alone or with others) make, conceive, create, discover, invent or reduce to practice any invention, modification, discovery, design, development, improvement, process, software program, work of authorship, documentation, formula, data, technique, know-how, trade secret, or intellectual property right whatsoever or any interest therein," those "Company Developments" would be the "sole and exclusive property of" tiag. Ex. 3, Assignment Agreement at Section 2(a) ("Developments").  Shkolnikov was obligated to "promptly disclose" each and every Company Development to tiag and "take all steps necessary to ensure" tiag's ownership of those developments.  *Id.*

27.     By virtue of signing the Assignment Agreement, Shkolnikov assigned "all rights, title and interest (including, but not limited to, all patent rights, copyrights and trademarks) in and to the Company Developments and all benefits and/or rights resulting therefrom to the Company and its assigns without further compensation and shall communicate to the Company, without cost or delay, and without disclosure to any third party, all available information relating to the Company Developments."  *Id.* at Section 2(a).

28.     The Assignment Agreement provided that Shkolnikov "irrevocably transfers and assigns to the Company: (i) all worldwide patents, patent applications, copyrights, mask works,

trade secrets, and other intellectual property and proprietary rights in and to any Company

Development; and (ii) any and all 'Moral Rights' . . . Employee may have in or with respect to

any Company Development."  Ex. 3, Assignment Agreement at Section 2(b).

29.     Both Section 2(a) and 2(b) of the Assignment Agreement, taken together, show

that Shkolnikov conclusively, without the need for further action, assigned all rights to Company

Developments, and intellectual property and moral rights in those Company Developments, to

tiag.

30.     With respect to Company Developments, the Assignment Agreement states that

"Company and Employee agree that Developments created by the Employee will only be

deemed to be Company Developments which are subject to the requirements of this Agreement

if such Developments are created by the Employee in the course of the performance of his

services as an employee of the Company."  Ex. 3, Assignment Agreement at Section 2(c).  While

the Assignment Agreement distinguishes developments made by the employee "before the

Company and the Employee entered into this agreement," or "subsequent or otherwise related to

these existing Developments," and/or any developments "conceived and created outside of the

scope of his services as an employee of the Company," the technologies and advancements at

issue here were Company Developments falling under Sections 2(a) and (b).  *Id.*

31.     By virtue of signing the Assignment Agreement, Shkolnikov further agreed that

"all information, concerning the Company's business, business relationships, intellectual

property, or financial affairs (collectively "*Proprietary Information*") of a private, secret or

confidential nature,[] whether or not in writing, is and shall be the exclusive property of the

Company."  Ex. 3, Assignment Agreement at Section 1.  The Assignment Agreement further

defined Proprietary Information to include, among other things, (1) Technology, (2) Other

Products and Services, and (3) Business Practices, Marketing Plans and Customer Lists.  *Id.*   In addition, Proprietary Information includes "[a]ll information . . . not generally known to the public or within the industries served by the Company, or any other trade in which Company competes, that gives Company an advantage over its competitors, and the physical embodiments of all such information in any tangible form."  *Id.*

32.     Shkolnikov also agreed that he "will not disclose any Proprietary Information to any person or entity or use the same for any purposes (other than in the performance of his/her duties as an employee of the Company), either during or after his/her employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by Employee."  Ex. 3, Assignment Agreement at Section 1.

33.     Shkolnikov further agreed that "all documents or other tangible materials in any form whatsoever containing Proprietary Information, whether or not created by Employee, that come into his/her custody or possession, are the exclusive property of the Company to be used by Employee only in the performance of his/her duties for the Company."  Ex. 3, Assignment Agreement at Section 1(b).  In addition, "[a]ll such materials or copies thereof and all tangible property of the Company in the custody, possession or control of Employee shall be delivered to the Company, at the Company's request or upon termination of his/her employment, and Employee shall not retain any such materials, tangible property, or copies thereof after such delivery.  *Id.*

34.     The technologies and advancements at issue in this case were and are Proprietary Information and Company Developments as defined in the Assignment Agreement, and not Employee Developments.  In particular, these technologies were developed by Shkolnikov, in

some cases in collaboration with Mr. Goeringer, in the course of his performance of services as an employee of tiag while working on tiag projects or for tiag customers.

35.     While Shkolnikov's Company Developments were assigned to tiag by operation of law, and without the need for further documentation, by virtue of the Assignment Agreement, Shkolnikov failed to ensure that these Company Developments remained the "sole and exclusive property of" tiag, failed to "promptly disclose" all facts about these Company Developments to tiag, and improperly attempted to assign "all rights, title and interest (including, but not limited to, all patent rights, copyrights and trademarks)" regarding these Company Developments to KEYnetik, knowing that he had already assigned these same rights to tiag.

36.     In violation of the Assignment Agreement, Shkolnikov also improperly disclosed these Proprietary Information and Company Developments in the patents and patent applications identified in paragraphs 37-43 below and on KEYnetik's website.

### Shkolnikov's Patent Activity

37.     On July 22, 2004, while employed by tiag and subject to the requirements and limitations of the Assignment Agreement, Shkolnikov filed U.S. Patent Application Serial No. 10/895,967, which issued as U.S. Patent No. 7,002,553 on February 21, 2006.  U.S. Patent No. 7,002,553 is entitled "Active Keyboard System for Handheld Electronic Devices" and names Shkolnikov as the sole inventor.  A true and correct copy of U.S. Patent No. 7,002,553 is attached hereto as Exhibit 4.  U.S. Patent No. 7,002,553 is a "continuation-in-part" of an earlier patent granted to Shkolnikov, and as such, necessarily adds new subject matter not disclosed in the earlier patent.

38.     Fred Goeringer at tiag helped to conceive of and develop the technologies disclosed and claimed in U.S. Patent No. 7,002,553, and thus is a co-inventor thereof.  Mr.

Goeringer conceived of and suggested numerous functional aspects and applications disclosed and claimed in this patent.  In particular, Mr. Goeringer is a co-inventor of at least claims 7 through 12, 22, 23, and 36 of this patent.  Mr. Goeringer met with Shkolnikov on several occasions – including, for example, at Shkolnikov's house – to discuss and collaborate on the development of the technologies disclosed and the specific inventions claimed in this patent.

39.      On April 11, 2008, while employed by tiag and subject to the requirements and limitations of the Assignment Agreement, Shkolnikov filed U.S. Patent Application Serial No. 12/101,578, entitled "Force Sensing Apparatus and Method to Determine the Radius of Rotation of a Moving Object," based on U.S. Provisional Patent Application Nos. 60/911,745 and 61/027,118, filed April 13, 2007 and February 8, 2008 respectively.  This application names Shkolnikov as the sole inventor and purports to assign the rights in and to U.S. Patent Application Serial No. 12/101,578 to KEYnetik, not tiag.  This application issued as U.S. Patent No. 7,966,146 on June 21, 2011, identifying KEYnetik as the assignee.  A true and correct copy of U.S. Patent No. 7,966,146 is attached hereto as Exhibit 5.

40.      On January 5, 2009, while employed by tiag and subject to the requirements and limitations of the Assignment Agreement, Shkolnikov filed U.S. Patent Application Serial No. 12/348,698, entitled "Split Qwerty Keyboard with Reduced Number of Keys," based on U.S. Provisional Patent Application No. 61/019,316, filed January 7, 2008.  This application names Shkolnikov as the sole inventor and purports to assign the rights in and to U.S. Patent Application Serial No. 12/348,698 to KEYnetik, not tiag.  A true and correct copy of U.S. Patent Application Serial No. 12/348,698 published as US 2009/0174669 is attached hereto as Exhibit 6.

41.     On July 6, 2009, while employed by tiag and subject to the requirements and limitations of the Assignment Agreement, Shkolnikov filed U.S. Patent Application Serial No. 12/498,111, entitled "Spatially Aware Inference Logic," based on U.S. Provisional Patent Application Nos. 61/078,638 and 61/113,738, filed July 7, 2008 and November 12, 2008, respectively.  This application names Shkolnikov and Yevgeniy Shkolnikov as inventors and purports to assign the rights in and to U.S. Patent Application Serial No. 12/498,111 to KEYnetik, not tiag.  A true and correct copy of U.S. Patent Application Serial No. 12/498,111 published as US 2010/0001949 is attached hereto as Exhibit 7.

42.     On July 10, 2009, while employed by tiag and subject to the requirements and limitations of the Assignment Agreement, Shkolnikov filed U.S. Patent Application Serial No. 12/500,640, entitled "Handheld Electronic Apparatus with Multiple Input Devices," based on U.S. Provisional Patent Application No. 61/079,996, filed July 11, 2008.  This application names Shkolnikov as the sole inventor and purports to assign the rights in and to U.S. Patent Application Serial No. 12/500,640 to KEYnetik, not tiag.  A true and correct copy of U.S. Patent Application Serial No. 12/500,640 published as US 2010/0007606 is attached hereto as Exhibit 8.

43.     Upon information and belief, KEYnetik and Shkolnikov have filed foreign patent applications based on the patents and patent applications identified in paragraphs 37-42 above.

44.     As of the filing of this Amended Complaint, Shkolnikov had not corrected his recorded assignments of the U.S. patents and patent applications in paragraphs 39-42 above to properly indicate tiag's ownership, as opposed to KEYnetik's.

45.     Each of the issued patents and filed patent applications identified in paragraphs 37-43 above relates to or arises from one or more Company Developments and the know-how

that Shkolnikov and others at tiag developed during Shkolnikov's employment at tiag, while

working on tiag projects for tiag customers.  Thus, these developments and technologies are

rightfully the property of tiag under the terms of Shkolnikov's employment agreements and were

assigned to tiag pursuant to the Assignment Agreement.

**Shkolnikov's Formation of KEYnetik, Inc. and Assignment of Patents**

46.     Upon information and belief, on November 15, 2005, while still employed by tiag

and in further violation of the terms and spirit of his employment agreements, Shkolnikov

formed the corporate entity KEYnetik, Inc. under the laws of the Commonwealth of Virginia.

47.     Upon information and belief, KEYnetik is a privately held corporation with Mark

Shkolnikov and Yevgeniy Shkolnikov as equity holders.

48.     Upon information and belief, while still a tiag employee Shkolnikov worked to

further the business of KEYnetik, in violation of certain provisions in his employment

agreements.

49.     While a tiag employee, Shkolnikov wrongfully listed KEYnetik as the assignee or

owner of the patents and patent applications identified in paragraphs 39-42 above.  Both

Shkolnikov and KEYnetik did so knowing that Shkolnikov had already assigned such inventions

to tiag pursuant to the Assignment Agreement.

50.     Upon information and belief, KEYnetik has used the patents described in

paragraphs 37 and 39 above, and/or the patent applications described in paragraphs 40-43 above,

as the basis for its product development aimed at the medical/life science handheld device,

personal digital assistant, and cell phone segments of the digital device industry.

51.     For example, KEYnetik advertises certain products believed to be based on the

technologies developed at tiag and described in the patents and/or patent applications, including

"Rock-N-Scroll," "Hi-N-Bye," "Shake-N-Break," and other digital handheld and software developer kit applications.  In fact, the technology used in the Hi-N-Bye product is specifically called out and claimed in U.S. Provisional Patent Application 61/078,638, filed July 7, 2008, which forms the basis of U.S. Patent Application Serial No. 12/498,111.  As described in paragraphs 25-36, this patent application is properly assigned to tiag and includes tiag's Proprietary Information and Company Developments.

52.     KEYnetik may have developed other products using the technologies at issue that have not been sold and/or advertised to the public yet.

53.     Tiag has not authorized Shkolnikov or KEYnetik, either expressly or impliedly, to use the technologies at issue that rightfully and solely belong to tiag for KEYnetik products or for KEYnetik's business.

54.     Tiag has received no payments from Shkolnikov or KEYnetik from the sales of KEYnetik products based on the technologies at issue, and thus has earned no profits from KEYnetik's use of the technologies.

55.     KEYnetik may intend to directly compete with tiag involving certain products or services that rely on or utilize the technologies at issue.

## COUNT I
### (Breach of Contract)

56.     Tiag incorporates the allegations contained in Paragraphs 1 through 55 above as though fully set forth herein.

57.     Each of the Letter Contract, Employment Agreement, and Assignment Agreement is a valid, binding contract between tiag and Shkolnikov.

58.     Tiag has fully performed its respective obligations under each of the Letter Contract, Employment Agreement, and Assignment Agreement.

59.    Tiag has not breached the Letter Contract, Employment Agreement, or Assignment Agreement.

60.    Shkolnikov improperly revealed tiag confidential and proprietary information to other parties without tiag's permission in violation of the Letter Contract, Employment Agreement, and/or Assignment Agreement.  For example, rather than "promptly disclose" his Company Developments to tiag, Shkolnikov filed for four patents without tiag's knowledge, attempted to assign those patents to KEYnetik, and used the technologies for KEYnetik's and/or his own benefit.

61.    Shkolnikov also caused tiag confidential and Proprietary Information, Company Developments, and other documents to be included in patent applications, with the intent that such information would be, and with the effect that such information was, disclosed to the public in an issued United States Letter Patent, published United States Patent Applications, and foreign patent filings based on the same.   For example, Shkolnikov, without tiag's knowledge or consent, incorporated many of the details of tiag's presentations and other written materials presented to tiag's customers into the patents and patent applications identified in paragraphs 37-43.  Merely by way of example, Shkolnikov incorporated the tiag Freehand Presentation in U.S. Patent No. 7,002,553 and on KEYnetik's website.  Additional tiag presentations and other written materials were incorporated into Shkolnikov's patent filings for U.S. Provisional Patent Application Nos. 61/113,738, 61/079,996, 61/078,638.

62.    Shkolnikov further failed to identify, deliver, and act consistently with having assigned intellectual property and related documentation to tiag, all in violation of the Letter Contract, Employment Agreement, and/or Assignment Agreement.  For example, Shkolnikov improperly attempted to assign to KEYnetik the inventions disclosed in the patent and the patent

applications identified in paragraphs 39-42 above, knowing that he had already assigned such rights to tiag.

63.     Shkolnikov also violated other specific provisions of the Letter Contract, Employment Agreement, Assignment Agreement, and/or the tiag Employee Handbook by acting in a manner inconsistent with his duties to maintain the technology and documents at issue as tiag's Proprietary Information.  For example Shkolnikov failed to deliver to tiag, upon termination of his employment, "all documents or other tangible materials in any form whatsoever containing Proprietary Information, whether or not created by [Shkolnikov], that [came] into his[] custody or possession" as required by paragraph 1(b) of the Assignment Agreement.  To the contrary, Shkolnikov has disclosed tiag's Proprietary Information and Company Developments in the patents and patent applications identified in paragraphs 37-43 and on KEYnetik's website.

64.     By failing to perform his obligations under and/or otherwise violating the terms of the Letter Contract, Employment Agreement, and/or Assignment Agreement, and by improperly attempting to assign the patents and patent applications to KEYnetik, Shkolnikov has materially breached important contractual obligations.

65.     As a result, Shkolnikov has deprived tiag of the benefit of the performance bargained for and contemplated in the Letter Contract, Employment Agreement and/or Assignment Agreement.

66.     Specifically, as a result of Shkolnikov's actions, KEYnetik is improperly recorded at the U.S. Patent and Trademark Office as the assignee on the patent and patent applications identified in paragraphs 39-42 above.  Because KEYnetik is improperly recorded as the assignee,

tiag's patent rights and the ability to assert those rights against potential infringers as granted by federal patent law, remains encumbered.

67.   In addition, as a result of Shkolnikov and KEYnetik's actions, tiag's confidential and Proprietary Information and Company Developments, which are valuable company assets, have been disclosed to the public and its competitors in the patents and patent applications identified in paragraphs 37-43 above, and on KEYnetik's website.

68.   Shkolnikov and KEYnetik have used tiag's Company Developments and Proprietary Information without the express authorization of tiag.

69.   Shkolnikov should be required to specifically perform his contractual obligations in the Letter Contract, Employment Agreement, and Assignment Agreement.

70.   Tiag has been materially harmed as a direct and proximate result of Shkolnikov's contractual breaches and KEYnetik's actions, and has incurred damages in an amount to be determined at trial, including:  lost profits, a reasonable royalty from sale of products based on tiag technologies, competitive harm, loss of confidential and proprietary information including trade secrets, and loss of patent rights.

## COUNT II
### (Correction of Inventorship:  U.S. Patent No. 7,002,553)

71.   Tiag incorporates the allegations contained in Paragraphs 1 through 70 above as though fully set forth herein.

72.   The cause of action in this Count II arises under Section 256 of the Patent Act, 35 U.S.C. § 256.

73.   U.S. Patent No. 7,002,553 lists Shkolnikov as the sole inventor.

74.   In fact, Fred Goeringer also contributed to the invention of the subject matter disclosed and claimed in U.S. Patent No. 7,002,553.  As described in paragraph 38 above, Mr.

Goeringer is a co-inventor of at least claims 7 through 12, 22, 23, and 36 of this patent.  For example, Mr. Goeringer conceived of and suggested numerous functional aspects and applications disclosed and claimed in this patent.  In particular, Mr. Goeringer is a co-inventor of at least claims 7 through 12, 22, 23, and 36 of this patent.  Mr. Goeringer met with Shkolnikov on several occasions – including, for example, at Shkolnikov's house – to discuss and collaborate on the development of the technologies disclosed and the specific inventions claimed in this patent.

75.     The omission of Fred Goeringer as an inventor of U.S. Patent No. 7,002,553 was erroneous.

76.     The failure to name Fred Goeringer as an inventor of U.S. Patent No. 7,002,553 did not result from any deceptive intent on Mr. Goeringer's part, or on the part of either party at the time.  Although Mr. Goeringer knew that Shkolnikov, in his role as Chief Technology Officer, might take actions to protect the intellectual property of tiag's Company Developments, Mr. Goeringer was never given any specifics about Shkolnikov's activities.  At no time during the patent prosecution process was Mr. Goeringer given an opportunity to review the specification or claims presented in the patent application which issued as U.S. Patent No. 7,002,553, nor was he advised about the possibility of being a co-inventor on the information being disclosed and claimed by Shkolnikov in U.S. Patent No. 7,002,553.  At the time, Mr. Goeringer had no reason to doubt that Shkolnikov was acting in the best interests of the company and faithfully to his duties and obligations as the Chief Technology Officer and pursuant to the Assignment Agreement.

77.     Tiag has ownership rights in U.S. Patent No. 7,002,553 by virtue of Shkolnikov's Assignment Agreement transferring "all rights, title and interest" in the patent to tiag.

78.     Mr. Goeringer has assigned all of his rights, title and interest in U.S. Patent No. 7,002,553 to tiag pursuant to assignment agreements executed October 18, 2011.

79.     The omission of Mr. Goeringer from the patent has injured and will injure tiag by depriving it of an ownership interest or financial stake in the patent, which can be redressed by correction of inventorship.

80.     In addition, tiag has a financial interest in correcting inventorship.  As the rightful assignee of U.S. Patent No. 7,002,553, tiag has a vested interest in preventing its patent rights from being extinguished by incorrect inventorship.  More specifically, if inventorship is not corrected the patent is at risk for being proven invalid.  If that were to occur, tiag would lose its rights to enforce the patent against infringers.  As a small business, tiag's success is built on the unique aspects of its Proprietary Information, including its intellectual property and Company Developments.  Tiag's Company Developments and Proprietary Information provide tiag with a business advantage over its competition.  For example, tiag's inability to properly assert a tiag patent would allow tiag's Company Developments and Proprietary Information disclosed in that patent to be freely used by competitors to service the industries in which tiag competes.  In fact, KEYnetik uses tiag's Company Developments and Proprietary Information in the products it advertises on its website.  In addition, tiag's customers could freely use tiag's Company Developments and Proprietary Information without the need to engage tiag for this business.

81.     Mr. Goeringer has notice of and has consented to this action to correct inventorship.

82.     Tiag has standing and is otherwise entitled to have the inventorship of U.S. Patent No. 7,002,553 corrected to reflect that Fred Goeringer is a co-inventor of the subject matter claimed therein.

## COUNT III
### (Conversion)

83.     Tiag incorporates the allegations contained in Paragraphs 1 through 82 above as though fully set forth herein.

84.     Pursuant to paragraph 1(a) of the Assignment Agreement, Shkolnikov agreed that he "will not disclose any Proprietary Information to any person or entity or use the same for any purposes (other than in the performance of his/her duties as an employee of the Company), either during or after his/her employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by Employee."  Ex. 3 at 2.

85.     Pursuant to paragraph 1(b) of the Assignment Agreement, Shkolnikov further agreed that "all documents or other tangible materials in any form whatsoever containing Proprietary Information, whether or not created by Employee, that come into his/her custody or possession, are the exclusive property of the Company to be used by Employee only in the performance of his/her duties for the Company."  Ex. 3 at 2.  In addition, "[a]ll such materials or copies thereof and all tangible property of the Company in the custody, possession or control of Employee shall be delivered to the Company, at the Company's request or upon termination of his/her employment, and Employee shall not retain any such materials, tangible property, or copies thereof after such delivery."  *Id.*

86.     Pursuant to paragraphs 2(a) and 2(b) of the Assignment Agreement, Shkolnikov has assigned to tiag all rights in and to the inventions disclosed in United States Patent Nos. 7,002,553 and 7,966,146, and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640, as well as numerous foreign patent filings based thereon.

87.     Presentations and other tangible material that Shkolnikov and KEYnetik took from tiag, including the presentations that have been improperly disclosed in the patents and

patent applications described in paragraphs 37-43, contain tiag's Proprietary Information and Company Developments and are the rightful property of tiag.  Defendants have wrongfully retained possession of tiag's Proprietary Information and Company Developments.

88.     As described above, Shkolnikov and KEYnetik have acted in a manner inconsistent with tiag's ownership of the Proprietary Information and Company Developments, some of which has now been disclosed in United States Patent Nos. 7,002,553 and 7,966,146 and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640, and any and all foreign patent filings based thereon.  Defendants have wrongfully retained control of tiag's Proprietary Information and Company Developments and the related documents and other tangible materials.

89.     As a result of Shkolnikov and KEYnetik's actions, tiag's Proprietary Information and Company Developments, valuable company assets, including but not limited to the information contained in the presentations and other written materials (paper and electronic), have been disclosed to the public and its competitors in the patents and patent applications identified in paragraphs 37-43 above, and on KEYnetik's website.

90.     As specifically indicated in the Assignment Agreement, this Proprietary Information includes information that is "not generally known to the public or within the industries served by [tiag], or any other trade in which [tiag] competes, that gives [tiag] an advantage over its competitors."  Ex. 3 at 1.

91.     As a result of the wrongful conversion of tiag's documents and other tangible materials by Defendants, tiag has suffered damages in an amount to be determined at trial.

### COUNT IV
**(Wrongful Misappropriation and Disclosure of Trade Secrets)**

92.     Tiag incorporates the allegations contained in Paragraphs 1 through 91 above as though fully set forth herein.

93.     Pursuant to the Letter Contract, Employment Agreement, and Assignment Agreement, and by virtue of his employment with tiag, tiag provided Shkolnikov with valuable technical information that is confidential and proprietary to tiag, including tiag's trade secrets.

94.     Tiag sought to keep all valuable technical information that is confidential and proprietary to tiag as a trade secret.  For example, as described in paragraphs 31-32 above, in the Assignment Agreement Shkolnikov specifically acknowledged and agreed that "all information, concerning the Company's business, business relationships, intellectual property, or financial affairs (collectively "*Proprietary Information*") of a private, secret or confidential nature,[] whether or not in writing, is and shall be the exclusive property of the Company."  Ex. 3 at 1. The Assignment Agreement also specifically included trade secrets in the definition of Company Developments.  *Id.* at 2.

95.     In addition, pursuant to the tiag Employee Handbook, "[a]ll [tiag] employees are expected to maintain the highest standards of confidentiality regarding information which they have obtained during the course of their employment with tiag."  As stated in the Confidentiality and Non-Disclosure provision therein,

> Employees of tiag may have access to confidential or proprietary information regarding tiag, our customers, vendors and suppliers.  Examples of such confidential information include, but are not limited to, information of a business nature such as proposals, marketing information, future plans, strategies and financial data, employee and customer data and lists, potential employee recruiting lists, computer programs, data files, reports, business tools and tiag business methods.

Tiag Employee Handbook at 27.  Also, all tiag bids and proposal documents are marked and intended to be kept confidential by the government agency seeking the bids.

96.     This valuable technical information at issue in this case was confidential and proprietary to tiag and derived its economic value in part from not being generally known and readily ascertainable by competitors to tiag and the public.  Indeed, paragraph 1(a)(4) of the

24

Assignment Agreement further defined Proprietary Information to include, among other things, "[a]ll information . . . not generally known to the public or within the industries served by the Company, or any other trade in which Company competes, that gives Company an advantage over its competitors, and the physical embodiments of all such information in any tangible form." Ex. 3 at 2.

97.     Shkolnikov knowingly violated the Letter Contract, Employment Agreement, and Assignment Agreement by disclosing and using tiag's valuable Proprietary Information and Company Developments to file and obtain the patents and patent applications identified in paragraphs 37-43 above, and by using this valuable proprietary and confidential technical information for the benefit of KEYnetik.  In addition, the development of a medical homunculus anatomical body image on a hand-held device that can be navigated with gesture input is a tiag proprietary work product.  Some of this information is contained in the Freehand Presentation, identified in paragraph 24 above.

98.     Shkolnikov and KEYnetik knowingly retained possession or control of tiag's Proprietary Information and Company Developments, such as a system for motion signal processing with inferential signal interpolation, a handheld electronic apparatus with multiple input devices, an active keyboard system for handheld electronic devices, a force sensing apparatus and method to determine the radius of rotation of a moving object, a spatially aware inference logic for devices with motion sensors, and a split qwerty keyboard with reduced number of keys, and willfully and maliciously disclosed this information to the public in the patents and patent applications identified in paragraphs 37-43 above and on KEYnetik's website. Shkolnikov and KEYnetik disclosed these trade secrets without tiag's knowledge or approval.

99.     Shkolnikov's disclosure and use of this information constitutes misappropriation of trade secrets in violation of statutory and common law, including the Virginia Uniform Trade Secrets Act.  Va. Code § 59.1-336 *et seq.*

100.     KEYnetik's wrongful use of tiag's proprietary and confidential information for its own gain, as described above in paragraphs 36-99, at the expense of tiag, constitutes misappropriation of trade secrets in violation of statutory and common law.

101.     As a direct and proximate result of the wrongful actions of Defendants, tiag has suffered damages in amount to be determined at trial.

102.     In addition, any ownership rights that Defendants may be deemed to have in the patents and patent applications identified in paragraphs 37-43 above should be equitably assigned to tiag.

103.     Further, Defendants should be deemed constructive trustees for tiag, and owe tiag an accounting for past profits and/or other damages with respect to the technical information and ownership rights at issue.

## COUNT V
### (Breach of Fiduciary Duty)

104.     Tiag incorporates the allegations contained in Paragraphs 1 through 103 above as though fully set forth herein.

105.     Tiag hired Shkolnikov, and tiag and Shkolnikov entered into the Letter Contract and subsequently the Employment Agreement and Assignment Agreement, for the purpose of developing and commercializing technology related to certain hand-held computing devices and applications.  During his tenure with tiag, as Chief Technology Officer, Shkolnikov owed tiag a fiduciary duty to act with the utmost good faith, fairness, and honesty with respect to tiag.

106.     Shkolnikov breached his fiduciary duty to act in the utmost good faith, fairness, and honesty with respect to tiag at numerous times and by numerous separate actions, including for example:  knowingly acting in a manner inconsistent with the reason he was hired, to develop and commercialize hand-held computing devices and applications for tiag's benefit; intentionally deceiving and inducing tiag and Mr. Goeringer specifically to partner with him in the development and future commercialization of hand-held computing devices and applications while surreptitiously forming a separate corporate entity to transfer technology that had been developed at tiag; using tiag's technology and documents for the benefit of KEYnetik while employed at tiag as Chief Technology Officer; wrongfully attempting to assign to KEYnetik patent rights for the inventions made under the Letter Contract, Employment Agreement, and the Assignment Agreement with tiag; and not acting reasonably to fulfill his obligations for the development and future commercialization of hand-held computing devices and applications with tiag.

107.     Shkolnikov's numerous breaches of his fiduciary duties were continuous or recurring and have deprived tiag of the benefits contemplated and bargained for by tiag in hiring Shkolnikov, and in the contractual agreements entered into between tiag and Shkolnikov.

108.     As a direct and proximate result of Shkolnikov's numerous breaches of his fiduciary duties, tiag has suffered damages in an amount to be determined at trial.

## COUNT VI
### (Fraud)

109.     Tiag incorporates the allegations contained in Paragraphs 1 through 108 above as though fully set forth herein.

110.     Tiag hired Shkolnikov, and tiag and Shkolnikov entered into the Letter Contract and subsequently the Employment Agreement and Assignment Agreement, for the purpose of

developing and commercializing technology related to certain hand-held computing devices and applications.  During his tenure with tiag, as Chief Technology Officer, Shkolnikov owed tiag a fiduciary duty to act with the utmost good faith, fairness, and honesty with respect to tiag.

111.   Shkolnikov engaged in fraud on tiag on numerous occasions and by numerous acts, including for example omitting and concealing material facts, such as:  his filing of the patent applications described above; his disclosure of tiag's Proprietary Information and Company Developments, including trade secrets, in those patent applications; his attempt to assign those patent applications to KEYnetik, a separate corporate entity he surreptitiously formed to transfer technology that had been developed at tiag; his failure to advise tiag or Mr. Goeringer of these actions; and otherwise concealing material facts about his actions concerning his use of tiag and tiag's customers to develop this technology for his own gain and the gain of his own company, KEYnetik.

112.   Shkolnikov could have and should have disclosed these facts to his supervisor, Mr. Goeringer, in the numerous meetings, telephone conferences, and email exchanges that they had on an almost weekly basis.

113.   Instead, Shkolnikov withheld these facts and continued to act, to tiag's knowledge at the time, as the Chief Technology Officer he was hired to be.  Tiag relied, to its detriment, on Shkolnikov's assurances and representations that he would work for the benefit of tiag, not against its interests.

114.   Tiag did not discover the filing of the patent applications in which Shkolnikov attempted to assign the ownership rights to KEYnetik until after Shkolnikov's employment with tiag ended in March 2010.

115.    Shkolnikov's numerous fraudulent acts have deprived tiag of the benefits contemplated and bargained for by tiag in hiring Shkolnikov and in the contractual agreements entered into between tiag and Shkolnikov.

116.    Shkolnikov's numerous fraudulent acts have allowed KEYnetik to exploit and commercialize tiag's Proprietary Information and Company Developments, including trade secrets, without tiag's consent and to tiag's financial detriment.

117.    Shkolnikov acted willfully, maliciously, and with extreme recklessness and gross negligence in omitting these material facts and committing this fraud.

118.    As a direct and proximate result of Shkolnikov's fraudulent acts, tiag has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff tiag requests relief against Defendants Mark Shkolnikov and KEYnetik, Inc. as follows:

A.    A judgment that Shkolnikov has breached the Letter Contract;

B.    A judgment that Shkolnikov has breached the Employment Agreement;

C.    A judgment that Shkolnikov has breached the Assignment Agreement;

D.    A declaration that the entire right, title and interest in and to United States Patent Nos. 7,002,553 and 7,966,146 and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640, and all related foreign patent filings to be determined the property of tiag;

E.    An order requiring Defendants to execute an assignment to tiag of all equitable and legal rights to United States Patent Nos. 7,002,553 and 7,966,146 and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640, and all related foreign patent filings;

F.      An order that Shkolnikov be required to specifically perform all of his obligations under the Letter Contract, Employment Agreement, and Assignment Agreement;

G.      An order correcting, or requiring Shkolnikov to correct, inventorship with the United States Patent and Trademark Office to list Fred Goeringer as a co-inventor of United States Patent No. 7,002,553;

H.      An order requiring Defendants to  provide an accounting for and disgorgement of past profits accruing to Mark B. Shkolnikov and/or KEYnetik, Inc. for their use, sale, licensing, or other purported transfer of United States Patent Nos. 7,002,553 and 7,966,146 and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640;

I.      An order requiring Defendants to provide an accounting for and disgorgement of past profits accruing to Mark B. Shkolnikov and/or KEYnetik, Inc. for their use, sale, licensing, or other purported transfer of the technologies described in United States Patent Nos. 7,002,553 and 7,966,146 and Patent Application Nos. 12/348,698, 12/498,111, and 12/500,640, or any other technologies developed or learned while Shkolnikov was employed by or worked for tiag;

J.      Damages, in an amount to be determined at trial, for the disclosure of tiag confidential and proprietary information to third parties;

K.      Damages, in an amount to be determined at trial, and to include lost profits or a reasonable royalty, for Defendants' use of tiag technology to market and sell products under the name KEYnetik;

L.      Damages, in an amount to determined at trial, for Shkolnikov's breach of contract, breach of fiduciary duty, and fraud;

M.      Punitive damages against Mark B. Shkolnikov and/or KEYnetik, Inc. as a result of their willful, malicious, reckless, and grossly negligent conduct; and

N.      Such further and other relief as the Court may deem just and appropriate.

## Jury Demand

Tiag hereby demands a trial by jury on all issues triable to a jury.

Dated: October 21, 2011                     Respectfully submitted,

                                             /s/ Daniel Campbell
                                            Daniel Campbell VSB #41320
                                             dcambell@crowell.com
                                            Jennifer H. Burdman (*pro hac vice*
                                                 application to be filed)
                                             jburdman@crowell.com
                                            CROWELL & MORING LLP
                                            1001 Pennsylvania Avenue NW
                                            Washington, DC 20004-2595
                                            Telephone:  (202) 624-2769
                                            Facsimile:  (202) 628-5116

                                            *Counsel for Plaintiff The Informatics*
                                            *Applications Group, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of October, 2011, a true and correct copy of

the foregoing *Amended Complaint* was filed electronically and served by operation of the

Court's electronic filing system to:

Christine P. Hsu
David S. Wachen
SHULMAN, ROGERS, GANDAL,
PORDY, & ECKER, P.A.
12505 Park Potomac Avenue, 6th Floor
Potomac, Maryland 20853
Telephone: (301) 230-5200
Facsimile: (301) 230-2891

   /s/ Daniel Campbell
Daniel Campbell VSB #41320
dcambell@crowell.com
Jennifer H. Burdman (*pro hac vice*
    application to be filed)
 jburdman@crowell.com
CROWELL & MORING LLP
1001 Pennsylvania Avenue NW
Washington, DC 20004-2595
Telephone:  (202) 624-2769
Facsimile:  (202) 628-5116

*Counsel for Plaintiff The Informatics
Applications Group, Inc.*