IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | | |
|---|---|---|
| THE INFORMATICS APPLICATIONS GROUP, INC., | ) ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | 1:11cv726 (JCC/JFA) |
| v. | ) | |
| | ) | |
| MARK B. SHKOLNIKOV, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendants' Motion
to Dismiss [Dkt. 23] (the "Motion").  For the following reasons,
the Court will grant in part and deny in part Defendants'
Motion.

**I. Background**

Plaintiff The Informatics Applications Group (the
"Plaintiff" or "TIAG") brings this case against its former
employee, Defendant Mark Shkolnikov ("Shkolnikov"), and his
company, Defendant KEYnetik, Inc. ("KEYnetik") (collectively,
the "Defendants"), alleging that Shkolnikov, during the course
of his employment, attempted to claim TIAG's technology as his
own in various patents and patent applications.

1

A.   Factual Background

1.   Shkolnikov's Employment at TIAG

TIAG develops and delivers information technology services and products to the federal government and the private sector.  (Amended Complaint [Dkt. 19] ("Am. Compl.") ¶¶ 1, 11.) Shkolnikov was employed by TIAG from March 1, 2002 until his employment was terminated on March 17, 2010.  (Am. Compl. ¶ 12.) He initially worked for TIAG as an independent contractor pursuant to an independent contractor agreement (the "Letter Contract") executed on February 25, 2002.  (Am. Compl. ¶ 13, Ex. 1.)  On May 1, 2003, Shkolnikov became a TIAG employee, and assumed the positions of Chief Technology Officer and Senior Systems Engineer.  (Am. Compl. ¶ 14.)  Shkolnikov entered into an employment agreement (the "Employment Agreement") that governed his employment at TIAG from May 1, 2003 until March 17, 2010.  (*Id*. Ex. 2.)  In connection with the Employment Agreement, Shkolnikov also executed a document titled "Assignment of Inventions, Non-Disclosure, and Non-Competition Agreement" (the "Assignment Agreement").[1]  (Am. Compl. ¶ 15, Ex. 3.)

Shkolnikov's duties at TIAG focused on research and development, particularly with respect to hand-held computing devices.  (Am. Compl. ¶¶ 16, 19-20, 22.)  Shkolnikov worked with

---

[1] These documents are collectively referred to herein as the "Employment Agreements."

other TIAG staff in pursuing small business innovative research grants and served as a senior engineer on TIAG contracts supporting major systems development acquisition programs. (Am. Compl. ¶¶ 16-17.)  Shkolnikov's work as a senior engineer centered on projects for the United States military and the United States Department of Defense.  (Am. Compl. ¶¶ 17, 20.)

While employed at TIAG, Shkolnikov reported to Fred Goeringer, TIAG's co-founder, managing principal, and Chief Information Officer.  (Am. Compl. ¶ 18.)  Shkolnikov's knowledge of information systems was enhanced by the nature of his duties at TIAG and collaboration with Goeringer and TIAG's customers. (Am. Compl. ¶ 19.)  While working on projects at TIAG, Shkolnikov, Goeringer, and others collectively developed technologies for hand-held devices and related systems, including the development of improved methods for user input and interaction.  (Am. Compl. ¶¶ 22-23.)  These innovative methods were often presented to TIAG's customers in written presentations, pursuant to non-disclosure and confidentiality agreements.  (Am. Compl. ¶ 24.)  One written presentation presented to a TIAG customer was entitled:  "Freehand: Data Entry and Screen Navigation Solution for Cell Phones, Personal Digital Assistants, Pagers, MP3 Players, Toys, GPS Receivers, e-Books, Remote Controls, Calculators, Cameras, Multimeters and Other Handheld Electronic Gadgets" (the "Freehand

3

Presentation"). (*Id*.) Shkolnikov, without TIAG's knowledge or consent, incorporated many of the details of this presentation in U.S. Patent No. 7,002,553 (the "'553 Patent") and on KEYnetik's website. (*Id*.)

> 2.   Shkolnikov's Employment Agreements

Under the terms of the Letter Contract, Shkolnikov agreed to the following:

> A1. OWNERSHIP OF MATERIALS RELATED TO
> SERVICES. The parties agree that all ideas,
> know-how, processes, information, drawings,
> documents, designs, models, inventions,
> copyrightable material and other tangible
> and intangible materials authored, prepared,
> created, made, delivered, conceived or
> reduced to practice, in whole or in part, by
> Contractor in the course of providing the
> Services, including without limitation
> computer programs, computer systems, data
> and documentation, (collectively, the
> "Works") are the sole and exclusive property
> of TIAG and shall be considered works made
> for hire.  In the event any such Works do
> not fall within the specifically enumerated
> works that constitute works made for hire
> under the United States copyright laws,
> Contractor hereby irrevocably, expressly and
> automatically assigns all right, title and
> interest worldwide in and to such Works to
> TIAG, including, without limitation, all
> copyrights, patent rights, trade secrets,
> trademarks, moral rights and all other
> applicable proprietary and intellectual
> property rights.

(Am. Compl. Ex. 1 at 6.)

The Assignment Agreement signed by Shkolnikov provided that:

> If at any time during his[] employment,
> Employee shall (alone or with others) make,
> conceive, create, discover, invent or reduce
> to practice any invention, modification,
> discovery, design, development, improvement,
> process, software program, work of
> authorship, documentation, formula, data,
> technique, know-how, trade secret, or
> intellectual property right whatsoever or
> any interest therein (whether or not
> patentable or registrable under patent,
> copyright, trademark, or similar statutes or
> subject to similar protection) (herein
> called **"Developments"**) that (i) relates to
> the Company's business, or that relates to
> the business of customers or suppliers of
> the Company and to activities undertaken by
> the Company on behalf of such customers or
> suppliers, or relates to any products or
> services being developed, manufactured or
> sold by the Company, (ii) results from tasks
> assigned to Employee by the Company or (iii)
> results from the use of premises, equipment
> or property (tangible or intangible) owned,
> leased, or contracted for by the Company
> (**"Company Developments"**), such Company
> Developments and the benefits thereof are
> and shall immediately become the sole and
> exclusive property of the Company and its
> assigns, as works made for hire.

(Am. Compl. Ex. 3 at 2.) Shkolnikov also agreed to "promptly

disclose" each Company Development to TIAG and "to take all

steps necessary" to ensure TIAG's ownership of those

developments. (*Id.*)

In executing the Assignment Agreement, Shkolnikov

assigned "all rights, title, and interest (including, but not

limited to, all patent rights, copyrights, and trademarks) in

and to the Company Developments and all benefits and/or rights

resulting therefrom to the Company and its assigns without

5

further compensation" and agreed that he "shall communicate to the Company, without cost or delay, and without disclosure to any third party, all available information relating to the Company Developments." (*Id.*)  Shkolnikov also agreed to "irrevocably transfer[] and assign[] to the Company: (i) all worldwide patents, patent applications, copyrights, mask works, trade secrets, and other intellectual property and proprietary rights in and to any Company Development; and (ii) any and all 'Moral Rights' . . . Employee may have in or with respect to any Company Development." (Am. Compl. Ex. 3 at 3.)

TIAG acknowledged in the Assignment Agreement that Shkolnikov had, prior to his employment, created "Developments" and could, during and after the period of his employment, create additional Developments. (*Id.*)  The parties agreed that such Developments would only be deemed Company Developments subject to the Assignment Agreement if created by Shkolnikov in the course of performing his duties as a TIAG employee. (*Id.*)  TIAG guaranteed that it would never claim any rights to any Developments "(A) done before the Company and the Employee entered into this agreement, (B) any Employee Developments subsequent or otherwise related to these existing Developments, and (C) any other Employee Developments conceived and created outside of the scope of his services as an employee of the Company." (*Id.*)

The Assignment Agreement further provided that "all information, concerning the Company's business, business relationships, intellectual property, or financial affairs (collectively "Proprietary Information") of a private, secret or confidential nature,[] whether or not in writing, is and shall be the exclusive property of the Company."  (Am. Compl. Ex. 3 at 1.)  The Assignment Agreement defined Proprietary Information to include, among other things, (1) Technology, (2) Other Products and Services, and (3) Business Practices, Marketing Plans and Customer Lists.  (*Id.*)  In addition, Proprietary Information included "[a]ll information . . . not generally known to the public or within the industries served by the Company, or any other trade in which Company competes, that gives Company an advantage over its competitors, and the physical embodiments of all such information in any tangible form."  (*Id.*)

Shkolnikov agreed that he would "not disclose any Proprietary Information to any person or entity or use the same for any purposes (other than in the performance of his[] duties as an employee of the Company), either during or after his[] employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by Employee."  (Am. Compl. Ex. 3 at 2.)  He further agreed that "all documents or other tangible materials in any form whatsoever containing Proprietary Information, whether or not

created by Employee, that come into his[] custody or possession, are the exclusive property of the Company to be used by Employee only in the performance of his[] duties for the Company." (*Id.*) In addition, "[a]ll such materials or copies thereof and all tangible property of the Company in the custody, possession or control of Employee shall be delivered to the Company, at the Company's request or upon termination of his[] employment, and Employee shall not retain any such materials, tangible property, or copies thereof after such delivery." (*Id.*)

TIAG alleges that the technologies at issue are Proprietary Information and Company Developments as defined in the Assignment Agreement, and not Employee Developments,[2] as the technologies were developed by Shkolnikov in the course of his employment at TIAG while working on projects for TIAG's customers. (Am. Compl. ¶ 34.) Shkolnikov allegedly breached the Employment Agreements by failing to ensure that Company Developments remained the "sole and exclusive property of" TIAG, failing to "promptly disclose" all facts about the Company Developments to TIAG, and attempting to assign all rights, title, and interest in Company Developments to KEYnetik. (Am. Compl. ¶ 35.) Shkolnikov also allegedly violated the Assignment Agreement by disclosing Proprietary Information and Company Developments in patents and patent applications and on KEYnetik's website. (Am. Compl. ¶ 36.)

---

[2] "Employee Developments" is not a defined term in the Assignment Agreement.

3.   Shkolnikov's Patent Activity

On July 22, 2004, while an employee of TIAG,
Shkolnikov filed U.S. Patent Application Serial No. 10/895,967,
which, on February 21, 2006, issued as U.S. Patent No. 7,002,553
(the "'553 Patent").  (Am. Compl. ¶ 37.)  The '553 Patent is
entitled "Active Keyboard System for Handheld Electronic
Devices" and names Shkolnikov the sole inventor.  (*Id*.)  The
'553 Patent states that it is a "[c]ontinuation in part of
application No. 10/320,529, filed on Dec. 17, 2002, now Pat. No.
6,947,028" (the "'028 Patent").  (*Id*., Ex. 4 at 1.)  Goeringer,
co-founder and managing principal of TIAG, helped develop the
technologies disclosed and claimed in the '553 Patent, but is
not listed as an inventor.  (Am. Compl. ¶ 38.)  TIAG alleges
that Goeringer is a co-inventor of at least claims 7 through 12,
22, 23, and 36 of the patent.  (*Id*.)  Goeringer and Shkolnikov
met on several occasions, including at Shkolnikov's house, to
discuss and collaborate on the development of the technologies
disclosed and the inventions claimed in the patent.  (*Id*.)  On
October 18, 2011 -- three days before TIAG filed the Amended
Complaint -- Goeringer assigned his purported ownership interest
in the '553 Patent to TIAG.  (Am. Comp. ¶ 78.)

On November 15, 2005, Shkolnikov formed KEYnetik,
Inc., a Virginia corporation with its principal place of
business in Virginia.  (Am. Compl. ¶¶ 3, 46.)  KEYnetik is a

9

privately held corporation, in which Shkolnikov and non-party Yevgeniy Shkolnikov are equity holders.  (Am. Compl. ¶ 47.) TIAG alleges that the formation of KEYnetik and Shkolnikov's work to further the business of KEYnetik violated the terms of the Employment Agreements.  (Am. Compl. ¶¶ 46, 48.)

After forming KEYnetik and while employed at TIAG, Shkolnikov filed four patent applications, which name Shkolnikov as inventor (in one instance with Yevgeniy Shkolnikov as co-inventor) and KEYnetik as assignee.[3]  (Am. Compl. ¶¶ 39-42.)  One of these patent applications was U.S. Patent Application Serial No. 12/101,578, entitled "Force Sensing Apparatus and Method to Determine the Radius of Rotation of a Moving Object," which Shkolnikov filed on April 11, 2008 and which was published on October 16, 2008.  (Am. Compl. ¶ 39, Ex. 5.)  This application issued as U.S. Patent No. 7,966,146 (the "'146 Patent") on June 21, 2011, and identifies KEYnetik as assignee.  (*Id.*)  The other patent applications were:  (1) U.S. Patent Application Serial No. 12/348,698, entitled "Split Qwerty Keyboard with Reduced Number of Keys," filed on January 5, 2009 and published as US 2009/0174669 (the "'669 Patent Application") on July 9, 2009; (2) U.S. Patent Application Serial No. 12/498,111, entitled "Spatially Aware Inference Logic," filed on July 6, 2009 and published as US 2010/0001949 (the "'949 Patent Application") on

---

[3] These four patent applications are collectively referred to herein as the "patent applications at issue."

January 7, 2010, and (3) U.S. Patent Application Serial No.
12/500,640, entitled "Handheld Electronic Apparatus with
Multiple Input Devices," filed on July 10, 2009 and published as
US 2010/0007606 (the "'606 Patent Application") on January 14,
2010.  (Am. Compl. ¶¶ 40-42, Exs. 6-8.)

> ### B.   Procedural Background

TIAG originally filed suit against Defendants on July
8, 2011.  [Dkt. 1.]  On September 6, 2011, Defendants filed a
motion to dismiss pursuant to Federal Rules of Civil Procedure
12(b)(1) and 12(b)(6).  [Dkt. 9.]  On October 11, 2011, the
Court dismissed the Complaint without prejudice pursuant to Rule
12(b)(1).  [Dkt. 18.]  The Court held that TIAG failed to
demonstrate standing as to its lone federal claim -- correction
of inventorship under 35 U.S.C. § 256.  (Memorandum Opinion
[Dkt. 16] ("Mem. Op.") at 13.)  Having dismissed the
jurisdiction-conferring Section 256 claim, the Court also
dismissed TIAG's state law claims.  (Mem. Op. at 14.)  TIAG was
given ten days to file an amended complaint.  (*See* Order [Dkt.
18].)

TIAG filed an Amended Complaint on October 21, 2011.
[Dkt. 19.]  The Amended Complaint again states a Section 256
claim with respect to the '553 Patent (Count II).  The remainder
of TIAG's claims arise under state law, and include (1) breach
of contract (Count I), (2) conversion (Count III), (3)

misappropriation of trade secrets (Count IV), (4) breach of fiduciary duty (Count V), and (5) fraud (Count VI).  Defendants moved to dismiss the Amended Complaint on October 31, 2011. [Dkt. 23.]  TIAG filed its opposition on November 21, 2011 [Dkt. 28] and Defendants filed their reply on December 2, 2011 [Dkt. 29].

 Defendants' Motion is before the Court.

## II.  Standard of Review

### A.  Subject Matter Jurisdiction

 Pursuant to Rule 12(b)(1), a claim may be dismissed for lack of subject matter jurisdiction.  Fed. R. Civ. P. 12(b)(1).  Defendants may attack subject matter jurisdiction in one of two ways.  First, defendants may contend that the complaint fails to allege facts upon which subject matter jurisdiction may be based.  *See Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982); *King v. Riverside Reg'l Med. Ctr.*, 211 F. Supp. 2d 779, 780 (E.D. Va. 2002).  In such instances, all facts alleged in the complaint are presumed to be true.  *Adams*, 697 F.2d at 1219; *Virginia v. United States*, 926 F. Supp. 537, 540 (E.D. Va. 1995).

 Alternatively, defendants may argue that the jurisdictional facts alleged in the complaint are untrue. *Adams*, 697 F.2d at 1219; *King*, 211 F. Supp. 2d at 780.  In that situation, "the Court may 'look beyond the jurisdictional

allegations of the complaint and view whatever evidence has been submitted on the issue to determine whether in fact subject matter jurisdiction exists.'" *Virginia v. United States*, 926 F. Supp. at 540 (quoting *Capitol Leasing Co. v. FDIC*, 999 F.2d 188, 191 (7th Cir. 1993)); *see also Velasco v. Gov't of Indonesia*, 370 F.3d 393, 398 (4th Cir. 2004) (holding that "the district court may regard the pleadings as mere evidence on the issue and may consider evidence outside the pleadings without converting the proceeding to one for summary judgment") (citations omitted).

In either circumstance, the burden of proving subject matter jurisdiction falls on the plaintiff. *McNutt v. Gen. Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *Adams*, 697 F.2d at 1219; *Johnson v. Portfolio Recovery Assocs.*, 682 F. Supp. 2d 560, 566 (E.D. Va. 2009) (holding that "having filed this suit and thereby seeking to invoke the jurisdiction of the Court, Plaintiff bears the burden of proving that this Court has subject matter jurisdiction").

B.   Failure to State a Claim

Rule 12(b)(6) allows a court to dismiss those allegations which fail "to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). A 12(b)(6) motion tests the legal sufficiency of the complaint. *Giarratano v. Johnson*, 521 F.3d 298, 302 (4th Cir. 2008). A court reviewing a

complaint on a 12(b)(6) motion must accept well-pleaded allegations as true and must construe factual allegations in favor of the plaintiff. *See Randall v. United States,* 30 F.3d 518, 522 (4th Cir. 1994).

A court must also be mindful of the liberal pleading standards under Rule 8, which require only "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8.  While Rule 8 does not require "detailed factual allegations," a plaintiff must still provide "more than labels and conclusions" because "a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007) (citation omitted).

To survive a 12(b)(6) motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*  However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to meet this standard, *id.*, and a plaintiff's "[f]actual allegations must be enough to

14

raise a right to relief above the speculative level . . . ." *Twombly*, 550 U.S. at 555. Moreover, a court "is not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 129 S.Ct. at 1949-50.

Rule 9(b) imposes a heightened pleading standard for fraud claims. "In alleging fraud [], a party must state with particularity the circumstances constituting fraud or mistake. Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). To satisfy the heightened pleading standard of Rule 9(b), a plaintiff must state with particularity "the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009) (quoting *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999)), *rev'd on other grounds* 131 S.Ct. 2296 (2011).

### III. Analysis

Defendants argue that TIAG fails to sufficiently plead standing as to its Section 256 claim. In the alternative, they argue that the Section 256 claim should be dismissed pursuant to Rule 12(b)(6). Defendants proceed to offer a number of reasons why each of TIAG's state law claims is deficient. The Court will address each of Defendants' arguments in turn.

15

A.   Count II: Correction of Inventorship

In its Section 256 claim, TIAG seeks correction of inventorship with respect to the '553 Patent.  Specifically, TIAG alleges that although the '553 Patent lists Shkolnikov as its sole inventor, Goeringer contributed to the technology underlying the patent and is a co-inventor thereof.  Defendants argue that TIAG lacks standing to pursue this claim and, alternatively, that TIAG fails to state a claim for relief.

1.   Subject Matter Jurisdiction

A party must satisfy constitutional standing requirements in order to invoke Section 256.  *Chou v. Univ. of Chicago*, 254 F.3d 1347, 1357 (Fed. Cir. 2001).  That is, the party must demonstrate that he has "suffered an injury-in-fact, that the injury is traceable to the conduct complained of, and that the injury is redressable by a favorable decision."  *Id.* (citing U.S. Const. art. III, § 2; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)).  To have standing to state a Section 256 claim, a party must assert either expected ownership rights in the patent at issue or a "concrete financial interest in the patent, albeit an interest less than ownership." *Id.* at 1358-59.[4]

---

[4] In *dicta,* the *Chou* court commented that it was "not implausible" that a "reputational interest alone is enough to satisfy the requirements of Article III standing," but declined to decide the issue as the plaintiff had alleged a concrete financial interest in the patent.  *Chou,* 254 F.3d at 1359.

In its October 11, 2011 Memorandum Opinion, the Court held that TIAG failed to establish standing to pursue its Section 256 claim.  (Mem. Op. at 11.)  It was not clear to the Court "how the exclusion of Goeringer as an inventor of the Patent injured TIAG, or how adding Goeringer as an inventor will provide a remedy." (*Id.*)  In its Amended Complaint, TIAG now alleges that on October 18, 2011, Goeringer assigned his purported ownership interest in the '553 Patent to TIAG.  (Am. Compl. ¶ 78.)  Given this assignment agreement, TIAG has now clearly alleged a potential ownership interest in the '553 Patent.  *See Memorylink Corp. v. Motorola, Inc.*, No. 08 C 3301, 2009 WL 464338, at *11 (N.D. Ill. Feb. 23, 2009) (finding that employer had standing to assert Section 256 claim given assignment agreement between employer and omitted inventors).

Defendants argue that the Court should consider whether the assignment is an improper attempt to manufacture jurisdiction.  (Memorandum in Support [Dkt. 24] ("Mem.") at 7.)  Here, the assignment agreement was executed after TIAG filed the original Complaint, but before it filed its Amended Complaint.  Pursuant to Federal Rule of Civil Procedure 15(d), a party may file a supplemental pleading that relates to matters occurring subsequent to the filing of the initial complaint.  *Franks v. Ross*, 313 F.3d 184, 198 n.15 (4th Cir. 2002).  To the extent TIAG's Amended Complaint refers to the assignment agreement

17

executed by Goeringer, it constitutes a supplemental pleading. *Id.* As the Fourth Circuit has noted, the filing of a supplemental pleading is an appropriate mechanism for curing numerous possible defects in a complaint, including, in some instances, jurisdictional defects. *See id.* at 198 (citing cases); *see also Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1159-60 (D. Kan. 2009) (granting motion to amend in patent infringement suit where plaintiff lacked ownership in patent, and hence standing, as of the date of the original complaint, but was subsequently assigned all right, title and interest in patent); *Randolph-Rand Corp. of N.Y. v. Shafmaster Co., Inc.*, No. CIV. 97-44, 1999 WL 814367, at *2 (D.N.H. Apr. 8, 1999) (denying motion for partial summary judgment, which asserted that plaintiff in patent infringement suit lacked standing when the original complaint was filed, where plaintiff had standing as of the date of the amended complaint).

Defendants cite *Armor Screen Corp. v. Storm Catcher*, No. 07-81091-Civ., 2008 WL 5746938, at *9 (S.D. Fla. Nov. 10, 2008). In that case, the defendants filed a motion to correct inventorship pursuant to Section 256. *Id.* at *1. However, at the time the motion was filed, no defendant was a purported inventor of the patent at issue nor did any defendant claim an ownership or concrete financial interest in the patent. *Id.* at *10. The purported inventor later assigned his putative

18

ownership rights in the patent to a defendant after the motion to correct inventorship had been filed.  *Id.*  The court held that the defendants still lacked standing.  *Id.*  The court reasoned that to hold otherwise, and allow the assignment to retroactively cure the defendant's standing deficiency would "enmesh th[e] Court in abstract disputes and would provide an incentive for parties to obtain after-the-fact assignments in order to expand their arsenal and the scope of litigation."  *Id.* (internal quotation marks omitted).

In *Armor Screen*, defendants raised the assignment in the reply brief in support of their original motion.  *Id.* at *3. Here, by contrast, TIAG filed an amended complaint, after being granted leave to do so by this Court.  Moreover, the assignment does not give TIAG standing retroactive to the date of the original Complaint, but rather establishes that TIAG has standing as of the date of the Amended Complaint and may proceed with its Section 256 claim as asserted in that pleading.  *See Bushnell*, 659 F. Supp. 2d at 1160.  It would be wasteful and inefficient to require TIAG to go through the formality and expense of instituting a new action solely because the assignment agreement was executed after the filing of the original Complaint.  *See Franks*, 313 F.3d at 198 (citation omitted).

Finally, Defendants argue that TIAG lacks standing to pursue its Section 256 claim because the '553 Patent is subject to a terminal disclaimer. (Reply [Dkt. 29] at 3 (citing Am. Compl. Ex. 4).) A terminal disclaimer allows an inventor to avoid a rejection by the PTO examiner for obviousness-type double patenting. *See* Manual of Patent Examining Procedure ("MPEP") § 804.02 (8th ed. 2010). Obviousness-type double patenting occurs where two applications are "drawn to inventions so very much alike as to render one obvious in view of the other." *Gerber Garment Tech., Inc. v. Lectra Sys., Inc.*, 916 F.2d 683, 686 (Fed. Cir. 1990). A rejection for obviousness-type double patenting prevents an inventor from extending the life of a patent by filing a substantially identical patent. *Id.* A terminal disclaimer avoids the rejection by limiting the life of the later-filed patent to that of the original patent. *See Ortho Pharm. Corp. v. Smith*, 959 F.2d 936, 940-41 (Fed. Cir. 1992). A patent with a terminal disclaimer is unenforceable if it is not commonly owned with the patent that formed the basis for the double-patenting rejection.[5] 37 C.F.R. § 1.321(c)(3). Here, the original patent is the '028 Patent, which lists Shkolnikov as sole inventor. (Opp. [Dkt. 28] Ex. 1 at 1.)

---

[5] The terminal disclaimer at issue states that "[t]he owner hereby agrees that any patent so granted on the ['553 Patent] application shall be enforceable only for and during such period that it and any patent granted on the ['028 Patent] application are commonly owned." (Opp. Ex. 4 at 59.)

According to Defendants, TIAG lacks standing because the addition of Goeringer to the '553 Patent would destroy common ownership with the '028 Patent, thereby rendering the '553 Patent unenforceable and precluding TIAG from obtaining any financial benefit or redress.  (Reply at 3.)  As TIAG points out, the Federal Circuit in *Frank's Casing Crew and Rental Tools, Inc. v. PMR Technologies., Ltd*., 292 F.3d 1363, 1377 (Fed. Cir. 2002), held that "[n]othing in the statute governing a court's power to correct inventorship, 35 U.S.C. 256, . . . prevents a court from correcting the inventorship of an unenforceable patent."[6]  There was no question that the patent was indeed unenforceable.  *See id.* ("[B]ecause of the Vincents' inequitable conduct the '063 patent is unenforceable, and Frank's cannot obtain any rights to an enforceable patent in this case.").  In reaching its holding, the court in *Frank's Casing Crew* appears to have focused on the statute as opposed to constitutional standing requirements.  However, as the Federal Circuit has noted, "[j]urisdiction is a threshold issue that the court may raise *sua sponte*" and, in fact, "a court has a duty to inquire into its jurisdiction to hear and decide a case."

_____

[6] Defendants attempt to discount *Frank's Casing Crew*, asserting that more recent Federal Circuit decisions hold that a plaintiff must have suffered an injury in fact to pursue a Section 256 claim.  (Reply at 3 n.3 (citing *Larson v. Correct Craft, Inc.*, 569 F.3d 1319 (Fed. Cir. 2009) and *Chou*).)  Contrary to Defendants' assertion, *Frank's Casing Crew* was decided eleven months after *Chou*.  Defendants also argue that *Frank's Casing Crew* is distinguishable because the unenforceability in that case resulted from independent grounds and not the pursuit of the Section 256 claim itself.  (Reply at 3 n.3.)  But what is relevant for purposes of the standing inquiry is *whether* the patent would be rendered unenforceable, not what caused the unenforceability.

*Special Devices, Inc. v. OEA, Inc.*, 269 F.3d 1340, 1342 (Fed. Cir. 2001).

In any event, the fate of the '553 Patent vis-à-vis the terminal disclaimer is not entirely clear at this stage of the litigation. As TIAG points out, no double-patenting rejection appears to have been made of the '553 Patent. (*See* Opp. Ex. 4.) And the filing of a terminal disclaimer is not itself an admission of obviousness. *Ortho Pharm. Corp.*, 959 F.2d at 941. Here, the only objections that the patent examiner made were under 35 U.S.C. §§ 102(b) and 103(a), neither of which can be overcome by a terminal disclaimer. *See* MPEP § 804.02 (stating that a terminal disclaimer cannot be used to obviate a rejection based on 35 U.S.C. §§ 102(e)/103(a)); *id.* § 706.02(b) (identifying ways of overcoming a 35 U.S.C. § 102(b) rejection). For these reasons, the Court rejects Defendants' argument that TIAG lacks standing to pursue its Section 256 claim.

### 2.   Failure to State a Claim

Defendants also argue that TIAG has failed to meet the pleading standards required to state a plausible claim for relief under Section 256. The elements of a Section 256 claim are: "(i) that the omitted person was a joint inventor; (ii) that the omission was the result of error; and (iii) that the

omission was without deceptive intent."[7]  *Applied Med. Res. Corp.
v. U.S. Surgical Corp.*, 967 F. Supp. 867, 871 (E.D. Va. 1997).

Upon review of the allegations in the Amended
Complaint, the Court concludes that TIAG has pleaded facts
sufficient for purposes of surviving a Rule 12(b)(6) motion.
The Amended Complaint identifies the claims, and thus the
subject matter, of the '553 Patent which Goeringer allegedly
helped to conceive and develop.  (*See* Am. Compl. ¶ 74; Opp. at
6-7.)  Specifically, these claims include:

- Configuring the active keyboard system for
  ambidextrous use in a number of ways, including
  by providing partial or full duplication of the
  input means on the system (claim 7), by allowing
  a user to rotate, reattach, slide, or move parts
  of the system (claim 8), and by including a
  partial or full duplication of the input means
  for inputting data into the system that includes
  at least one additional set of movement sensor(s)
  configured to sense motion in different
  dimensions and a second plurality of keys (claim
  36);

- Configuring the plurality of keys on the active
  keyboard system to inhibit unintentional
  engagement (claim 9),

- Configuring the active keyboard system as a
  cellular phone, a personal digital assistant, a
  global positioning receiving device, a remote
  control, a computer mouse, a pager, a walkie-
  talkie, a scanner, or a multi-meter (claim 10),

- Configuring some or all of the components of the
  active keyboard system as a sleeve to operatively

---

[7] The Court noted in its October 11, 2011, Memorandum Opinion that TIAG failed
to plead that Goeringer -- *i.e.*, the omitted inventor -- acted without
deceptive intent.  (Mem. Op. at 13.)  TIAG properly pleads this element in
its Amended Complaint.  (Am. Compl. ¶ 76.)

attach to and be used in combination with a
handheld electronic device (claim 11),

- Configuring the sleeve configuration of the
active keyboard system described in claim 11 in
combination with a handheld electronic device
configured as a cellular phone, a personal
digital assistant, a global positioning receiving
device, a remote control, a computer mouse, a
pager, a walkie-talkie, a scanner, or a multi-
meter (claim 12),

- Configuring the filter code of the active
keyboard system to separate intentional user
input from accidental user motion (claim 22), and

- Including in the filter code of the active
keyboard system an external forces filter code to
separate user input from effects of external
forces (claim 23).

(Opp. at 7 (citing Am. Compl. Ex. 4 at col. 18, lines 25-50,
col. 19, lines 16-21, and col. 20, lines 23-55).)   TIAG also
alleges that Goeringer and Shkolnikov met several times to
discuss and collaborate on the technology underlying the '553
Patent.   (*See* Am. Compl. ¶ 74.)   In short, TIAG pleads
sufficient factual allegations to state a plausible claim for
relief, and adequately place Defendants on notice of what the
claim is and the ground upon which it rests.   *See Twombly*, 550
U.S. at 555.

Defendants also argue that TIAG's Section 256 claim
should be dismissed under Rule 12(b)(6) because, given the
terminal disclaimer, correction of inventorship would render the
patent unenforceable.   (Reply at 5.)   In the cases cited by
Defendants, courts declined to correct inventorship where the

24

correction would necessarily have required the court to make a finding that the patents were invalid. *See Or. Health & Sci. Univ. v. Vertex Pharms., Inc.*, 233 F. Supp. 2d 1282, 1285 (D. Or. 2002) ("Congress has conferred no jurisdiction on the federal courts to adjudicate a patent's validity in a Section 256 action to correct inventorship."); *see also Britesmile, Inc. v. Discus Dental, Inc.*, No. C 02-03220, 2005 WL 1083194, at *4 (N.D. Cal. May 9, 2005) ("[T]o name Dr. Nathoo as an inventor on the patents at issue would necessarily require the Court to make a finding that the patents are invalid. Thus, Dr. Nathoo may not bring claims to correct the inventorship of the patents at issue pursuant to Section 256."). In both *Oregon Health* and *Britesmile*, the omitted inventor communicated his invention after the patent application was filed, but before the patent was issued. Thus, naming him as an inventor on the patent would have necessarily required the court to make a "finding that defendant was not in possession of the claimed subject matter at the time it filed its application or, in other words, that the patent [was] invalid." *Oregon Health*, 233 F. Supp. 2d at 1285; *see also Britesmile*, 2005 WL 1083194 at *4.

As the court noted in *Britesmile*, Section 256 is a savings provisions designed to prevent patents from being rendered invalid, and relief may not be granted under Section 256 that would itself require a finding of invalidity. 2005 WL

25

1083194 at *4 (citing *Pannu v. Iolab Corp.*, 155 F.3d 1344, 1350 (Fed. Cir. 1998)).  Here, however, TIAG's Section 256 claim does not require the Court to determine that the '553 Patent is *invalid*.  Rather, it is Defendants' contention that the addition of Goeringer as an inventor of the '553 Patent would render the patent *unenforceable*.  And, as noted above, "[n]othing in the statute governing a court's power to correct inventorship, 35 U.S.C. 256, . . . prevents a court from correcting the inventorship of an unenforceable patent."  *Frank's Casing Crew*, 292 F.3d at 1377.[8]

B.    Count I: Breach of Contract

In Count I, TIAG alleges that Defendants breached Shkolnikov's Employment Agreements by improperly revealing Proprietary Information to the public, wrongfully retaining Proprietary Information, and attempting to assign patents based on TIAG technology to KEYnetik.  (*See* Am. Compl. ¶¶ 60-63.)

---

[8] Defendants attempt to distinguish *Frank's Casing Crew*, arguing that there "[t]he invalidity of the patent . . . rested on grounds independent of the correction of inventorship claim." (Reply at 5 n.4) *Frank's Casing Crew*, however, dealt with an unenforceable patent, not an invalid one.  Invalidity and unenforceability are distinct concepts in patent law. *See Gardco Mfg., Inc. v. Herst Lighting Co.*, 820 F.2d 1209, 1213 (Fed. Cir. 1987) ("The simple fact is that a patent may be valid and yet be rendered unenforceable . . . ."); *see also The Boeing Co. v. United States*, 69 Fed. Cl. 397, 423 (Fed. Cl. 2006) (noting that while the patents affected by a terminal disclaimer are enforceable only during periods in which they are commonly owned, "the continued validity of the affected patents does not, by virtue of the disclaimer, become completely intertwined").  As discussed above, correction of inventorship would not require the Court to find the '553 Patent invalid, but rather may render the patent unenforceable.  Defendants cite no authority demonstrating that the Court is precluded from granting relief under Section 256 in this situation.

Defendants argue that the claim is time-barred and that TIAG fails to state a plausible claim.

## 1.   Statute of Limitations

In Virginia,[9] the statute of limitations for breach of a written contract is five years.  Va. Code § 8.01-246(2) (2011).  A claim for breach of contract accrues at the time of the breach.  *Locke v. Johns-Manville Corp.*, 221 Va. 951, 959 (Va. 1981); *see also Hunter v. Custom Bus. Graphics*, 635 F. Supp. 2d 420, 431 (E.D. Va. 2009) (citing Va. Code § 8.01-230).  Under Virginia law, statutes of limitations are strictly enforced and exceptions thereto are construed narrowly.  *Arrington v. Peoples Sec. Life Ins. Co.*, 250 Va. 52, 55 (Va. 1995).

Defendants argue that TIAG's breach of contract claim accrued at the latest when the patent application for the '553 Patent was filed on July 22, 2004, outside the five-year limitations period.  (Mem. at 12.)  They also contend that because the '553 Patent relates to one or more Company Developments and the technology that Shkolnikov and others at TIAG developed during Shkolnikov's employment, (*id.* (citing Am. Compl. ¶ 45)), the statute of limitations has run on the remainder of TIAG's breach of contract claim, which is merely a

---

[9] The Court is exercising supplemental jurisdiction over TIAG's state law claims pursuant to 28 U.S.C. § 1367(a).  In exercising supplemental jurisdiction over the state law claims, the Court must apply Virginia's substantive law.  *Johnson v. Hugo's Skateway*, 974 F.2d 1408, 1416 n.7 (4th Cir. 1992); *Brown v. Mitchell*, 327 F. Supp. 2d 615, 628 n.27 (E.D. Va. 2004).

continuation of the original breach that occurred upon the filing of the '553 Patent.

In response, TIAG argues that the statute of limitations did not begin to run on its breach of contract claim until Shkolnikov acted in a manner adverse to TIAG's ownership of the '553 Patent and patent applications at issue. (Opp. at 18.) TIAG points out that unlike the other patent applications, Shkolnikov did not purport to assign the '553 Patent to KEYnetik. (*Id.*) It is TIAG's position that all rights in the '553 Patent were immediately assigned to TIAG upon the filing of the patent application for the '553 Patent by operation of the Assignment Agreement. (Opp. at 9.)

The Court concludes that the breach of contract claim is untimely as to the '553 Patent. In the Amended Complaint, TIAG points to clauses in the Assignment Agreement, in which Shkolnikov agreed that he would "not disclose any Proprietary Information to any person or entity or use the same for any purposes . . . either during or after his [] employment with the Company, unless and until such Proprietary Information has become public knowledge without fault by Employee." (Am. Compl. ¶ 32.) And, in its breach of contract claim, TIAG alleges that Shkolnikov, without its knowledge or consent, incorporated Proprietary Information and Company Developments in patent applications, with the effect that this information was

28

disclosed to the public.  (Am. Compl. ¶ 61.)  TIAG specifically alleges that Shkolnikov incorporated the Freehand Presentation into the '553 Patent.  (*Id.*)  Shkolnikov could have incorporated Proprietary Information into the '553 Patent no later than the date the patent application was filed -- July 22, 2004.[10]  The Court fails to see how Shkolnikov did not, based on the allegations in the Amended Complaint, act in a manner adverse to TIAG and breach the contracts at issue by allegedly using and disclosing to the public TIAG's Proprietary Information in the patent application for the '553 Patent.[11]  Thus, the Court agrees with Defendants that the breach of contract claim is untimely as to the '553 Patent.

Nor would subsequent acts of misappropriation involving the Proprietary Information disclosed in the '553 Patent constitute separate breaches that would independently trigger the statute of limitations.  In Virginia, the statute of limitations for a misappropriation claim indicates that "a

---

[10] TIAG argues that because patent applications are private, the filing date of an application should not trigger the statute of limitations.  In Virginia, however, the statute of limitations for a breach of contract claim does not contain a discovery rule, and accrues when the injury actually occurs.  *See* Va. Code 8.01-230 ("[T]he right of action shall be deemed to accrue and the prescribed limitation period shall begin to run . . . when the breach of contract occurs in actions *ex contractu* and not when the resulting damage is discovered . . . .").  And, in any event, the '553 Patent was published on December 30, 2004, and issued on February 21, 2006.  (*See* Am. Compl. Ex. 4 at 1.)  Both dates are also outside the limitations period for a breach of contract claim.  The Court will likewise apply the filing date as the relevant date for triggering the statute of limitations on TIAG's conversion and breach of fiduciary duty claims, for which the discovery rule is also inapplicable.  *See* Sections III.C.1, III.E.1, *infra*.

[11] Indeed, as discussed further below, the Freehand Presentation, which was incorporated into the '553 Patent, bore a copyright notation demonstrating Shkolnikov's claimed ownership and intention to file for patent protection.

continuing misappropriation constitutes a single claim." Va. Code § 59.1-340 (2011). Other courts have rejected a "continuous breach" theory when it would provide an end run around the statute of limitations for a misappropriation claim. *See Athletic Alternatives, Inc. v. Benetton Trading USA, Inc.*, 174 F. App'x 571, 575 (Fed. Cir. 2006) (unpublished) (applying Arizona law, where the statute of limitations for a misappropriation claim identically provides that "a continuing misappropriation constitutes a single claim"); *see also Hunter*, 635 F. Supp. 2d at 433 (rejecting continuous breach theory where "there was nothing 'new' about [defendant's] alleged breaches").

To the extent TIAG alleges that Shkolnikov breached his Employment Agreements by converting tangible material related to the '553 Patent, those allegations too are largely based on the misappropriation of intangible material. (*See* Am. Compl. ¶ 63; *see also* Am. Compl. ¶¶ 87, 89.) It would be similarly anomalous to conclude that the subsequent conversion of tangible material related to the '553 Patent constitutes separate breaches of the Employment Agreements for statute of limitations purposes, when the misappropriation of the intangible material contained therein would not operate in like fashion with respect to TIAG's misappropriation claim. And, based on TIAG's own theory, Shkolnikov never attempted to assign the '553 Patent to KEYnetik. For these reasons, the Court

30

determines that TIAG's breach of contract claim is untimely as to the '553 Patent.[12]

The Court, however, rejects Defendants' theory that TIAG's breach of contract claim is time-barred as it relates to the '146 Patent and the patent applications at issue because it is a continuation of the breach that occurred when Shkolnikov filed the patent application for the '553 Patent.  Defendants' sole support for their theory is TIAG's contention that the '553 Patent and patent application "relate[] to or arise[] from *one* or more Company Developments and the know-how that Shkolnikov and others at [TIAG] developed during Shkolnikov's employment." (Opp. at 12 (emphasis in original) (citing Am. Compl. ¶ 45).) The Court fails to see how this allegation renders the '553 patent so related to the '146 Patent and the patent applications at issue that they all constitute one continuous breach. Rather, the Court finds that the breach of contract claim as to the '146 Patent and the patent applications at issue would have occurred no earlier than the dates when *those* applications were filed -- all of which fall within the limitations period. Unlike *Hunter*, these breaches were new -- they involved different, if related, intellectual property and unauthorized assignments to KEYnetik.  Thus, TIAG's breach of contract claim

---

[12] As Defendants point out, KEYnetik was formed in 2005.  (Mem. at 12 n.7 (citing Am. Compl. ¶ 46).)  Thus, TIAG's breach of contract claim is also untimely to the extent TIAG alleges that Shkolnikov breached the Employment Agreements by forming KEYnetik.

is timely except as it relates to the '553 Patent and the formation of KEYnetik.

### 2.   Failure to State a Claim

In Virginia, the elements of a claim for breach of contract are (1) a legally enforceable obligation of a defendant to a plaintiff, (2) the defendant's violation or breach of the obligation, and (3) an injury or harm to the plaintiff caused by the defendant's breach. *Ulloa v. QSP, Inc.*, 271 Va. 72, 79 (Va. 2006).

Defendants argue that TIAG cannot plausibly claim that Shkolnikov breached his Employment Agreements because the documents attached to the Amended Complaint indisputably show that the intellectual property in question belongs to Defendants.  (Mem. at 12-18.)  The bulk of Defendants' argument applies to the '553 Patent.  Specifically, Defendants contend that the '553 Patent is an Employee Development, and not a Company Development subject to the Assignment Agreement because (1) the '553 Patent is a continuation-in-part[13] of the '028 Patent, which indisputably belongs to Shkolnikov; (2) the '553 Patent is subject to a terminal disclaimer; and (3) the Freehand

---

[13] A continuation-in-part is a patent application filed during the lifetime of an earlier application that repeats some substantial portion or all of the earlier application, and adds matters not disclosed in the earlier application.  MPEP § 201.08.

Presentation bears the following copyright notation: "Copyright © 2001, 2002, 2003 by Mark Shkolnikov."[14]  (Mem. at 12-18.)

The Court has determined that the breach of contract claim is untimely as to the '553 Patent.  Defendants also, however, attempt to apply this argument to the '146 Patent and the patent applications at issue.  They argue that a review of the prior art disclosure for the patent applications attached as exhibits to the Amended Complaint reveals that the claimed inventions relate to the Shkolnikov's body of work before he began his employment at TIAG.  (Mem. at 15 n.10.)

The Court disagrees.  Whether the '146 Patent and the patent applications at issue involve technology developed in the course of Shkolnikov's employment at TIAG, and qualify as Company Developments as TIAG alleges, or are Employee Developments, is a question of fact that cannot be decided on a motion to dismiss.  *See Andrew v. Clark*, 561 F.3d 261, 267 (4th Cir. 2009); *Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007) (a district court may not resolve factual disputes on a

_____

[14] The parties disagree on whether the Court may consider this document, as it is not attached to the Amended Complaint.  However, a court may consider a document attached to a motion to dismiss if it is "integral to and explicitly relied on in the complaint and if the plaintiffs do not challenge its authenticity." *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004).  TIAG expressly referenced the Freehand Presentation in its Amended Complaint.  Moreover, Shkolnikov's alleged improper use of the Freehand Presentation, and other presentations, is integral to TIAG's claims.  While TIAG claims that it contests the authenticity of the document attached to Defendants' Motion to Dismiss, it does not state a basis for any such challenge other than appending a similar document -- which bears a similar copyright notation -- to its opposition.  For these reasons, the Court may consider the Freehand Presentation attached to Defendants' Motion.

Rule 12(b)(6) motion without converting the motion into one for summary judgment).  Contrary to Defendants' assertions, it is not clear from the face of the Amended Complaint or the documents attached thereto that the '146 Patent and the patent applications at issue are Employee Developments.  In essence, Defendants ask the Court to make an impermissible inference in its favor.  *See W. Refining Yorktown, Inc. v. BP Corp. N. Am., Inc.*, 618 F. Supp. 2d 513, 526-27 (E.D. Va. 2009).  At this stage, however, the Court must accept TIAG's allegations as true, *see Iqbal*, 129 S. Ct. at 1949, and draw all reasonable inferences in favor of the plaintiff, *see Andrew*, 561 F.3d at 270.  Defendants' argument also requires the interpretation of ambiguous terms in Shkolnikov's Employment Agreements, which is inappropriate in connection with a motion to dismiss.  *See Beacon Wireless Solutions, Inc. v. Garmin Int'l, Inc.*, No. 5:11-CV-00025, 2011 WL 4737404, at *11 (W.D. Va. Oct. 5, 2011) (interpretation of contract on ambiguous issue "constitutes a question of fact that is inappropriate for resolution on this Rule 12(b)(6) motion to dismiss"); *W. Refining Yorktown*, 618 F. Supp. 2d at 527 (denying motion to dismiss because "both parties have advanced reasonable interpretations of the ambiguous contract provisions, [and] extrinsic evidence not presently before the Court is necessary to resolve the ambiguity").  For these reasons, the Court rejects Defendants' argument that TIAG

34

has failed to state a plausible claim for breach of contract as to the '146 Patent and the patent applications at issue.

### C.   Count III: Conversion

In Count III, TIAG alleges that Defendants wrongfully converted presentations and other tangible material containing Proprietary Information.  Defendants argue that TIAG's conversion claim fails because (1) the claim is untimely, (2) the claim does not involve tangible property nor does TIAG allege that it has been "deprived" of property, and (3) the claim is preempted.

### 1.   Statute of Limitations

The statute of limitations for a conversion claim in Virginia is five years from the date the cause of action accrues.  *Bader v. Central Fidelity Bank,* 245 Va. 286, 290 (Va. 1993) (applying Va. Code § 8.01-243(B) to conversion claim). Under Virginia law, "[a] person is liable for conversion for the wrongful exercise or assumption of authority over another's goods, depriving the owner of their possession, or any act of dominion wrongfully exerted over property in denial of, or inconsistent with, the owner's rights." *Simmons v. Miller*, 261 Va. 561, 582 (Va. 2001).

Defendants argue that TIAG's conversion claim is untimely to the extent the alleged conversion occurred with the filing of the '553 Patent.  (Mem. at 21-22.)  Defendants also

argue that the conversion claim is untimely as to the Freehand Presentation, as it was incorporated into the '553 Patent, and any conversion would have necessarily occurred before the issuance of the patent.  (Mem. at 22.)  TIAG responds by stating that the conversion claims are not dependent on the filing of the '553 Patent.  (Opp. at 19.)  TIAG again argues that it was not until Shkolnikov acted adversely to TIAG's ownership of TIAG's technology, information, and documents that the statute of limitations began to run.  (Opp. at 20.)

The Court finds TIAG's argument unpersuasive.  As discussed above, Shkolnikov misappropriated TIAG's Proprietary Information and Company Developments when he allegedly disclosed and used that information in the patent application for the '553 Patent.  At that time, he likewise exercised dominion over the tangible material -- paper or electronic copies of documents and presentations -- which contained the intangible material.  Thus, the conversion claim is untimely as to the '553 Patent. However, the '146 Patent and the patent applications at issue were all filed within the limitations period, and involved different intellectual property.  TIAG may therefore proceed on its conversion claim as to those patent documents.

2.   Tangible Property and Deprivation

Defendants next argue that TIAG's claim fails because it does not involve tangible property.  (Mem. at 18.)  While a

36

claim for conversion traditionally has been a means to recoup

tangible property, "courts have recognized the tort of

conversion in cases where intangible property rights arise from

or are merged with a document." *Combined Ins. Co. of Am. v.

Wiest*, 578 F. Supp. 2d 822, 835 (W.D. Va. 2008) (citing *United

Leasing Corp. v. Thrift Ins. Corp.*, 247 Va. 299, 305 (Va.

1994)).   While TIAG alleges that Defendants "have wrongfully

retained control of [TIAG's] Proprietary Information and Company

Developments," (Am. Compl. ¶ 88), it also contends that

Defendants took presentations, documents, and other tangible

material (*id.* ¶¶ 87-89).   This tangible material may properly

support a conversion claim.   *See In re Outside Tire Litig.*, No.

1:09cv1217, 2010 WL 2929626, at *5 (E.D. Va. July 21, 2010)

(finding sufficient evidence that defendant improperly took

plaintiff's blueprints to support conversion claim).   Because

TIAG alleges that it has been deprived of tangible property, the

cases cited by Defendants, which involve intangible property,

are distinguishable.[15]   (*See* Mem. at 19.)

        Defendants proceed to argue that TIAG's allegations

concerning tangible property fail to satisfy the pleading

standard set forth in *Iqbal* and *Twombly*.   In support of its

---

[15] Defendants also cite *Christen v. Iparadigms, LLC*, No. 1:10cv620, 2010 WL
3063137, at *2 (E.D. Va. Aug. 4, 2010).   There, the court dismissed a
conversion claim based on allegations that the defendant deprived plaintiff
of her exclusive rights to her property by storing digital copies of the
plaintiff's manuscripts in its database. *Id.*   Here, however, TIAG alleges
that Shkolnikov took tangible material, both paper and electronic. (*See* Am.
Compl. ¶¶ 87-89.)

conversion claim, however, TIAG alleges that Shkolnikov improperly took its presentations, which he then incorporated in patent documents.  (Am. Compl. ¶¶ 24, 87.)  This is a factual allegation sufficient for purposes of surviving Defendants' Motion to Dismiss.

The Court also rejects Defendants' argument that TIAG fails to allege that it has been deprived of property. According to Defendants, TIAG cannot claim that it has been deprived of the presentations referenced in the Amended Complaint because those presentations have been disclosed in parents and patent applications, and on KEYnetik's website, and hence are readily available.  (Mem. at 20 (citing Am. Compl. ¶¶ 87, 89).)  Again, Defendants rely on cases that are distinguishable, and which involved intangible property.  (Mem. at 20-21.)

Other courts have rejected Defendants' narrow reading of what constitutes "deprivation." *See, e.g.*, *E.I. DuPont de Nemours & Co. v. Kolon Indus., Inc.*, 688 F. Supp. 2d 443, 455 (E.D. Va. 2009).  In *DuPont*, the court rejected the argument that a defendant could not be liable for conversion of copies of documents.  *Id.*  *DuPont* recognized the willingness of Virginia courts to expand scope of the doctrine of conversion in Virginia in light of advancing technology, *id.* (citing *United Leasing Corp*, 247 Va. at 304), as well as the expansive definition of

38

conversion, *i.e.*, '*any act of dominion* wrongfully exerted over property in denial of, or inconsistent with, the owner's rights,'" *id.* (emphasis in original) (quoting *Simmons*, 261 Va. at 582). As the court noted in *In re Outsidewall Tire Litigation*, "[t]he mere fact that defendants may not have converted the only copy of [a document] does not somehow negate the deprivation to plaintiffs or render the converted object intangible." 2010 WL 2929626, at *5.

Moreover, while TIAG's presentations might have been disclosed in publicly available documents, such as patents or patent applications, or a publicly viewable website, the use of those presentations potentially deprived TIAG of the ability to court customers with those presentations or to obtain ownership in intellectual property based on the technologies described therein. *See DuPont*, 688 F. Supp. 2d at 455 (observing that use of a copy by a competitor to court the owner's customer actually deprives the owner of ability to use the original with that customer, especially if the customer is persuaded to do business with the competitor). For these reasons, the Court finds that TIAG has adequately alleged that it has been deprived of tangible property for purposes of stating a conversion claim.

3.   Preemption

A conversion claim based on alleged misappropriation of patent rights is preempted by federal law. *See United States*

39

*ex rel. Berge v. Bd. of Trustees of the Univ. of Ala.*, 104 F.3d 1453, 1463 (4th Cir. 1997) (conversion claim preempted where the "plaintiff alleges only the unlawful retention of its intellectual property rights and not the unlawful retention of the tangible object embodying its work"). As discussed above, however, TIAG alleges that Defendants deprived it of tangible property. That the tangible property at issue relates to intellectual property does not trigger preemption. *See In re Outsidewall Tire Litig.*, 2010 WL 2929626, at *5-6 (blueprints containing intellectual property gave rise to a conversion claim); *DuPont*, 688 F. Supp. 2d at 454-55 ("[C]ourts have recognized the tort of conversion in cases where intangible property rights arise from or are merged with a document.") Therefore, TIAG's conversion claim is not preempted.

        D.   Count IV:  Misappropriation of Trade Secrets

Count IV of the Amended Complaint alleges that Shkolnikov misappropriated TIAG's trade secrets by incorporating Proprietary Information and Company Developments in patents and patent applications, and using Proprietary Information for the benefit of KEYnetik. (Am. Compl. ¶ 97.) Defendants argue that TIAG's misappropriation claim is time-barred and, alternatively, that TIAG fails to state a plausible claim. (Mem. at 22-24.)

### 1.   Statute of Limitations

In Virginia, a claim for misappropriation must be brought "within three years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered."  Va. Code § 59.1-340.  The statute further provides that "[f]or the purposes of this section, a continuing misappropriation constitutes a single claim."  *Id.*  TIAG asserts that its misappropriation claim is not time-barred, because it was not aware that Shkolnikov has disclosed its trade secrets in patent documents until Shkolnikov's employment was terminated.  (Opp. at 21.)  The Court does not find this argument persuasive.  Courts have recognized that the publicly noticed filing of patent protection may constitute constructive knowledge for purposes of discovering a claim based on the misappropriation of trade secrets and commencing the statute of limitations.  *Adv. Cardiovascular Sys., Inc. v. Medtronic Vascular, Inc.*, 182 F. App'x 994, 2006 WL 1478513 at *4 (Fed. Cir. 2006) (unpublished).  Here, TIAG had a duty to investigate public patent documents, given that the Freehand Presentation, which it claims is its Proprietary Information, bears a copyright notation with Shkolnikov's name and the years 2001, 2002, and 2003 and indicates "Patent Pending."  (Mem. Ex. 2; Opp. Ex. 1.)  Therefore, TIAG had at least constructive notice that its trade secrets had been included in the patent documents

relating to the '553 Patent more than three years before this suit was filed.  Accordingly, TIAG's misappropriation claim is time-barred as to the '553 Patent and the Freehand Presentation incorporated therein.  Because the patent application for the '146 Patent was published[16] on October 16, 2008, and the patent did not issue until June 21, 2011, the misappropriation claim is timely as to it.  TIAG's misappropriation claim is also timely as to the other patent applications at issue, all of which were published within the limitations period.

### 2.   Failure to State a Claim

TIAG's misappropriation claim arises under the Virginia Uniform Trade Secrets Act (the "VUTSA") pursuant to Va. Code § 59.1-336, *et seq.*  To establish a claim under the VUTSA, a plaintiff must prove that (1) the information in question constitutes a trade secret, and (2) the defendant misappropriated it.  *See MicroStrategy, Inc. v. Bus. Objects, S.A.,* 331 F. Supp. 2d 396, 416 (E.D. Va. 2004).

The first question raised by Defendants' Motion is whether TIAG adequately alleges a trade secret.  The VUTSA defines a "trade secret" as:

> [I]nformation, including but not limited to, a
> formula, pattern, compilation, program, device,
> method, technique, or process, that:

---

[16] Because patent applications are private before publication, the Court shall treat the publication date, and not the filing date, as the date that TIAG was on constructive notice of Defendants' alleged misappropriation.  The Court shall use the same approach with respect to TIAG's fraud claim, which is also subject to the discovery rule.  *See* Section III.F.1, *infra.*

1. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and

2. Is subject to efforts that are reasonable under the circumstances to maintain its secrecy.

Va. Code § 59.1-336; *see also MicroStrategy, Inc.,* 331 F. Supp. 2d at 416 (explaining that, to constitute a trade secret, "information must be of a subject matter entitled to trade secret protection, must have independent economic value as a result of not being generally known and not being readily ascertainable by proper means; and reasonable efforts must have been taken to maintain its secrecy."). Many classes of information can constitute a trade secret, including customer lists and marketing and sales techniques. *Id.* (citation omitted).

Upon review of the allegations in the Amended Complaint, the Court concludes that TIAG has validly pleaded the existence of a trade secret. The Amended Complaint is built upon the notion that TIAG's Proprietary Information was valuable because it was not generally available. (*See, e.g.*, Am. Compl. ¶ 96.) TIAG also outlines the language in Shkolnikov's Assignment Agreement and its Employee Handbook designed to protect the secrecy of its Proprietary Information. (Am. Compl. ¶¶ 31-32, 94-95); *see also MicroStrategy*, 331 F. Supp. 2d at 416

43

(stating that "only reasonable efforts must be taken to maintain secrecy," which includes implementing confidentiality agreements).

The Court also rejects Defendants' argument that TIAG has merely described "idea[s] for a product" and not trade secrets. All of the trade secrets TIAG identifies are methods for developing and improving the functionality of information systems -- specifically with respect to hand-held devices. (*See* Am. Compl. ¶¶ 97-98.) Contrary to Defendants' argument, TIAG has adequately identified trade secrets. *See Raybestos-Manhattan, Inc. v. Rowland*, 460 F.2d 697, 700 (4th Cir. 1972) (concluding that invention conceived within the scope of employee's employment which employee submitted for patent protection constituted a trade secret). The Court also rejects Defendants' argument that TIAG's Proprietary Information was not secret given that much of it relates to work for the Government. *See MicroStrategy*, 331 F. Supp. 2d at 416 (stating that "secrecy need not be absolute; the owner of a trade secret may, without losing protection, disclose it to a licensee, an employee, or a stranger if the disclosure is made in confidence, express or implied") (internal quotation marks omitted).

The second question is whether TIAG has adequately alleged that the trade secret was misappropriated. The VUTSA defines "misappropriation" as the:

44

1. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

2. Disclosure or use of a trade secret of another without express or implied consent by a person who

   (a) Used improper means to acquire knowledge of the trade secret; or

   (b) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was

       (1) Derived from or through a person who had utilized improper means to acquire it;

       (2) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use;

       (3) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

       (4) Acquired by accident or mistake.

Va. Code Ann. § 59.1-336; *see also MicroStrategy,* 331 F. Supp. 2d at 415-16.

Here, TIAG alleges that Shkolnikov misappropriated its trade secrets by incorporating Company Developments and Proprietary Information in patent applications. (Am. Compl. ¶¶ 37-42, 45.)  These allegations sufficiently establish misappropriation. *See Raybestos-Manhattan,* 460 F.2d at 700 (employee's submission of invention developed within scope of employment for patent protection "warrant[ed] the equitable relief and protection" sought by plaintiff, and was a

45

misappropriation of its trade secret.)  Thus, the Court
concludes that TIAG has adequately alleged a claim for
misappropriation of trade secrets.

### E.   Count V:  Breach of Fiduciary Duty

In Count V, TIAG asserts a claim for breach of
fiduciary duty.  Defendants argue that the claim is time-barred,
and, alternatively, that TIAG fails to state a plausible claim.

### 1.   Statute of Limitations

An action for breach of fiduciary duty is subject to a
two-year statute of limitations.  Va. Code §§ 8.01-230, 8.01-248
(2011); *Singer v. Dungan*, 45 F.3d 823, 827 (4th Cir. 1995).  The
two-year limitations period runs from the date of the alleged
breach, and is not extended by the discovery rule.  *Goldstein v.
Malcolm G. Fries & Assocs., Inc.*, 72 F. Supp. 2d 620, 626 & n.4
(E.D. Va. 1999).  The elements of a claim for breach of
fiduciary duty are (1) a fiduciary duty, (2) breach, and (3)
damages resulting from the breach.  *Carstensen v. Chrisland
Corp.*, 247 Va. 433, 444 (Va. 1994).  An employee has "a duty
not to reveal confidential information obtained through his
employment, and not to use such confidential information after
he has left his employment."  *Bull v. Logetronics, Inc.,* 323 F.
Supp. 115, 133 (E.D. Va. 1971).  By using this information, a
former employee is "appropriating, in effect, to his competitive
advantage what rightfully belongs to his employer."  *Id.*

46

(quoting *Cmty. Counseling Serv. v. Reilly,* 317 F.2d 239, 244 (4th Cir. 1963)).

The breach of fiduciary duty claims accrued when Shkolnikov filed the patent applications and disclosed TIAG's Proprietary Information.  All of these filing dates -- except for the '606 Patent Application, which was filed on July 10, 2009 -- occurred outside the limitations period.  TIAG again argues that the filing of the patent application for the '553 Patent was not necessarily adverse, but at the same time alleges that Shkolnikov breached the Assignment Agreement by incorporating Proprietary Information into patent applications, including that for the '553 Patent.  (Am. Compl. ¶ 61.) Shkolnikov could not have breached a contract he entered with TIAG by disclosing Proprietary Information to the public without also breaching his fiduciary duty to TIAG.  *See Khader v. Hadi Enters.*, No. 1:10cv1048, 2010 WL 5300876, at *5 (E.D. Va. Dec. 22, 2010) ("Fiduciary duties create a higher duty of care between parties than do contractual duties.  It follows logically, then, that one who states a claim for breach of contract . . . has sufficiently pleaded a claim for breach of fiduciary duty.")

The Court rejects TIAG's argument that the statute of limitations did not start to run until the last act that Shkolnikov took in violation of his obligation or duty.  TIAG

47

cites *Guthrie v. Flanagan*, No. 3:07cv479, 2007 WL 4355320 (E.D.
Va. Dec. 11, 2007), but that case is readily distinguishable.
*Guthrie* was a professional malpractice case in which the court
determined that "where there is a continuous or recurring course
of professional services related to a particular undertaking,
the breach occurs when the attorney's services with respect to
the particular undertaking or transaction have terminated." *Id.*
at *2. Shkolnikov was not providing a "continuous or recurring
course of professional services" to TIAG, and thus *Guthrie* does
not apply. *See Hunter*, 635 F. Supp. 2d at 431 (noting that the
situations in which the continuing undertaking doctrine applies
are "extremely limited"). Thus, TIAG's breach of fiduciary duty
claim is untimely except as to the '606 Patent Application.[17]

## 2. Failure to State a Claim

Defendants also argue that TIAG fails to plead a claim
for breach of fiduciary duty, essentially recycling their
argument that TIAG has failed to make a plausible showing that
the technology underlying the '553 Patent and the patent
applications at issue are Company Developments. The Court
rejects Defendants' argument for the reasons stated above.
Accordingly, TIAG has stated a valid claim for breach of
fiduciary duty as to the '606 Patent Application.

---

[17] The formation of KEYnetik in 2005 also falls outside the limitations
period.

F.    Count VI: Fraud

In Count VI, TIAG alleges that Shkolnikov engaged in fraud by omitting and concealing material facts including his filing of patent applications, misappropriation of TIAG's trade secrets, and his attempts to assign intellectual property to KEYnetik.  (Am. Compl. ¶ 111.)  Defendants argue that TIAG's fraud claim is time-barred and, alternatively, that it fails to meet the particularity requirements of Rule 9(b).

1.    Statute of Limitations

In Virginia, the statute of limitations for fraud is two years, and begins running when the alleged fraud is discovered or should have been discovered by the exercise of reasonable diligence.  Va. Code Ann. §§ 8.01-243, 8.01-249 (2011); *Va. Imports, Inc. v. Kirin Brewery of Am., LLC*, 296 F. Supp. 2d 691, 699 (E.D. Va. 2003).  This discovery rule places the burden on the plaintiff "to prove that he acted with due diligence and yet did not discover the fraud or mistake until within the statutory period of limitation immediately preceding the commencement of the action."  *Hughes v. Foley*, 203 Va. 904, 907 (Va. 1962).  To comply with the due diligence requirement, the plaintiff must use "[s]uch a measure of prudence, activity, or assiduity, as is properly to be expected from, and ordinarily exercised by, a reasonable and prudent [person] under the

49

particular circumstances." *STB Marketing Corp. v. Zolfaghari*, 240 Va. 140, 144 (Va. 1990).

The Court finds TIAG's fraud claim as to the '553 Patent untimely, because TIAG was on constructive notice of Shkolnikov's alleged fraud no later than February 21, 2006, the date the patent issued. *See Int'l Bus. Machines Corp. v. Zachariades*, No. C 91-20419, 1993 WL 443409, at *2-3 (N.D. Cal. Oct. 27, 1993) (issuance of patent put plaintiff on constructive notice of, among other things, a fraud claim), *aff'd in part, rev'd in part on other grounds*, 70 F.3d 1278 (Table), 1995 WL 697210 (9th Cir. Nov 22, 1995). Here, the issuance of the '553 Patent gave TIAG sufficient information to alert it of the facts that form the basis of its fraud claim -- namely, that Shkolnikov was, as TIAG alleges, misappropriating TIAG's trade secrets. The Court also finds that the publication of the patent application for the '146 Patent on October 16, 2008 (*see* Am. Compl. Ex. 5 at 1) was sufficient to place TIAG on constructive notice and trigger the statute of limitations on TIAG's fraud claim. The patent application would have revealed that Shkolnikov was misappropriating TIAG's trade secrets related to the '146 Patent and purporting to assign intellectual property to KEYnetik in violation of the Assignment Agreement. Thus, TIAG's fraud claim is also untimely as to the '146 Patent. The Court finds that the fraud claim is timely with respect to

the other patent applications at issue -- the '669 Patent

Application, the '949 Patent Application, and the '606 Patent

Application -- all of which were published within the

limitations period.

2. <u>Failure to State a Claim</u>

A plaintiff alleging fraud by silence, as TIAG does

here, must allege (1) the information that was withheld, (2) the

general time period during which the fraudulent conduct

occurred, (3) the relationship giving rise to the duty to speak,

and (4) what the person or entity engaged in the fraudulent

conduct gained by withholding the information. *See Wheeler v.*

*Bishop*, No. 3:07cv00044, 2008 WL 110452, at *3-4 (W.D. Va. Jan.

8, 2008) (citation omitted).

In the Amended Complaint, TIAG specifies the material

facts which Shkolnikov allegedly omitted and concealed: (1) his

filing of patent applications;[18] (2) his disclosure of TIAG's

Proprietary Information and Company Developments, including

trade secrets, in those patent applications; and (3) his attempt

to assign those patent applications to KEYnetik. (Am. Compl. ¶

111.) This fraudulent conduct allegedly occurred, for example,

in meetings, telephone conferences, and e-mail exchanges between

Shkolnikov and Goeringer in which Shkolnikov failed to reveal

---

[18] Defendants point out that the Freehand Presentation, which was incorporated
into the '553 Patent, bore a copyright notation with Shkolnikov's name and
indicated "Patent Pending." (Reply at 16.) The Court has already found
TIAG's fraud claim untimely as to the '553 Patent. Defendants do not point
to similar evidence with respect to the patent applications at issue.

his patent activity.  (Am. Compl. ¶ 112.)  TIAG alleges that
Shkolnikov owed TIAG a fiduciary duty as a result of his
employment at TIAG.  (Am. Compl. ¶ 110).  And, Shkolnikov was
allegedly able to use and commercialize TIAG's technology for
his benefit and the benefit of KEYnetik by withholding this
information.  (Am. Compl. ¶¶ 111, 116.)  TIAG further alleges
that Shkolnikov acted willfully and maliciously (Am. Compl. ¶
117), that TIAG relied to its detriment on Shkolnikov's
nondisclosure (Am. Compl. ¶ 113), and that TIAG has suffered
damages as a proximate result (Am. Compl. ¶ 118).  Accepting
these allegations as true and drawing all reasonable inferences
in favor of TIAG, the Court finds that TIAG has sufficiently
pleaded a claim for fraud with the particularity required by
Rule 9(b).

        G.   <u>KEYnetik</u>

       Defendants argue that KEYnetik is not implicated in
any of TIAG's claims.  TIAG responds that "KEYnetik is alleged
to have used [TIAG's] Company Developments and technology
without the express authorization of TIAG, and is thus
implicated in the breach of contract (Count I), conversion
(Count III) and misappropriation and disclosure of [TIAG's] []
trade secrets (Count IV) claims." (Opp. at 30.)  Of course,
KEYnetik could not have breached a contract with TIAG, when TIAG
does not allege that KEYnetik is a party to the contracts in

question.  Accordingly, KEYnetik is dismissed as to Count I.

However, TIAG does implicate KEYnetik in its claims for

conversion and misappropriation of trade secrets.  For example,

TIAG alleges that KEYnetik is the assignee listed in the patent

applications at issue, and that KEYnetik has included TIAG's

Proprietary Information, including contents of TIAG

presentations, on its website.  (Am. Compl. ¶¶ 39-42, 63, 67,

87-89, 98, 100.)  Therefore, TIAG has adequately connected

KEYnetik to Counts III and IV for purposes of surviving

Defendants' Motion.

        With respect to Counts II, V, and VI, TIAG points out

that it has alleged that Shkolnikov is an *alter ego* of KEYnetik.

(Opp. at 30.)  Courts have recognized that reverse veil-

piercing, *i.e.*, seeking to reach the assets of a corporation to

satisfy claims against a corporate insider, is permissible under

Virginia law.  *See, e.g.*, *C.F. Trust, Inc. v. First Flight Ltd.*

*P'ship*, 111 F. Supp. 2d 734, 741 (E.D. Va. 2000).  In Virginia,

"the standards for veil piercing are very stringent, and

piercing is an *extraordinary measure* that is permitted only in

the most egregious circumstances."  *Oliver v. Omega Protein,*

*Inc.*, No. 3:10cv47, 2011 WL 1044403, at *5 (E.D. Va. Jan. 31,

2011) (emphasis in original) (internal quotation marks omitted).

In Virginia, the burden of proof rests upon the party seeking to

pierce the corporate veil.  *Buffalo Wings Factory, Inc. v. Mohd*,

No. 1:07cv612, 2008 WL 4642163, at *6 (E.D. Va. Oct. 15, 2008).

A court can pierce the corporate veil only upon a showing that

"(1) the corporation was the '*alter ego*, alias, stooge, or

dummy' of the other entity; and (2) 'the corporation was a

device or sham used to disguise wrongs, obscure fraud, or

conceal crime.'"  *Id.* (quoting *Cheatle v. Rudd's Swimming Pool*

*Supply Co.*, 234 Va. 207, 212 (Va. 1987)).

        Here, TIAG fails to plead any facts demonstrating

either element of the test.  Rather, TIAG merely alleges that

"[o]n information and belief, Shkolnikov is an owner of, doing

business as, and an *alter ego* of KEYnetik." (Am. Compl. ¶ 4.)

Of course, the Court is "not bound to accept as true a legal

conclusion." *Iqbal*, 129 S.Ct. at 1949-50.  TIAG provides no

factual enhancement to its allegation that Shkolnikov is an

*alter ego* of KEYnetik.  Accordingly, KEYnetik is dismissed as to

Counts II, V, and VI.

### IV.   Conclusion

        For these reasons, the Court will grant in part and

deny in part Defendants' Motion to Dismiss.

        An appropriate Order will issue.

|  | /s/ |
|---|---|
| December 27, 2011 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |